994 F.2d 1344
 George E. LAYMAN, et al., Plaintiffs,
v.
Brownell COMBS, II, et al., Defendants.
Frank L. BRYANT, Counter-claimant-Appellant,
v.
George E. LAYMAN and George E. Layman, Jr., d/b/a Forest
Acres Partnership, a Washington general partnership; Barry
K. Schwartz and Calvin Klein d/b/a Barry K. Schwartz
Partnership; Earl H. Schultz; and Kenneth Franzhein, II,
Counter-claim-defendants-Appellees.
George E. LAYMAN, et al., Plaintiffs,
v.
Brownell COMBS, II, et al., Defendants.
BATEMAN EICHLER, HILL RICHARDS, INC., and Robert J.
McGuiness, Counter-claimants-Appellants,
v.
George E. LAYMAN and George E. Layman, Jr., d/b/a Forest
Acres Partnership, a Washington general partnership; Barry
K. Schwartz and Calvin Klein d/b/a Barry K. Schwartz
Partnership; Earl H. Schultz; and Kenneth Franzhein, II,
Counter-claim-defendants-Appellees.
George E. LAYMAN, et al., Plaintiffs,
v.
Brownell COMBS, II, et al., Defendants.
Charles R. HEMBREE; Kincaid, Wilson, Schaeffer and Hembree,
P.S.C., Counter-claimants-Appellants,
v.
George E. LAYMAN and George E. Layman, Jr., d/b/a Forest
Acres Partnership, a Washington general partnership; Barry
K. Schwartz and Calvin Klein d/b/a Barry K. Schwartz
Partnership; Earl H. Schultz; and Kenneth Franzhein, II,
Counter-claim-defendants-Appellees.
H. James GRIGGS, Plaintiff,
v.
Brownell COMBS, II, et al., Defendants.
BATEMAN EICHLER, HILL RICHARDS, INC., and Robert J.
McGuiness, Counter-claimants-Appellants,
v.
H. James GRIGGS, Counter-claim-defendant-Appellee.
H. James GRIGGS, Plaintiff,
v.
Brownell COMBS, II, et al., Defendants.
Charles R. HEMBREE; Kincaid, Wilson, Schaeffer and Hembree,
P.S.C., Counter-claimants-Appellants,
v.
H. James GRIGGS, Counter-claim-defendant-Appellee.
Zenya YOSHIDA d/b/a Shadai Farm, Plaintiff,
v.
Brownell COMBS, II, et al., Defendants.
Frank L. BRYANT, Defendant-counter-claimant-Appellant,
v.
Zenya YOSHIDA d/b/a Shadai Farm, Counter-claim-defendant-Appellee.
Zenya YOSHIDA d/b/a Shadai Farm, Plaintiff,
v.
Brownell COMBS, II, et al., Defendants.
BATEMAN EICHLER, HILL RICHARDS, INC.; Robert J. McGuiness,
Counter-claimants-Appellants,
v.
Zenya YOSHIDA d/b/a Shadai Farm, Counter-claim-defendant-Appellee.
Zenya YOSHIDA d/b/a Shadai Farm, Plaintiff,
v.
Brownell COMBS, II, et al., Defendants.
Charles R. HEMBREE; Kincaid, Wilson, Schaeffer and Hembree,
P.S.C., Counter-claimants-Appellants,
v.
Zenya YOSHIDA d/b/a Shadai Farm, Counter-claim-defendant-Appellee.
Robert D. STRATMORE, Plaintiff,
v.
Leslie COMBS, II, et al., Defendants.
Frank L. BRYANT, Counter-claimant-Appellant,
v.
Robert D. STRATMORE, Counter-claim-defendant-Appellee.
Robert D. STRATMORE, Plaintiff,
v.
Leslie COMBS, II, et al., Defendants.
BATEMAN EICHLER, HILL RICHARDS, INC., and Robert J.
McGuiness, Counter-claimants-Appellants,
v.
Robert D. STRATMORE, Counter-claim-defendant-Appellee.
Robert D. STRATMORE, Plaintiff,
v.
Leslie COMBS, II, et al., Defendants.
Charles R. HEMBREE, and Kincaid, Wilson, Schaeffer and
Hembree P.S.C., Counter-claimant-Appellants,
v.
Robert D. STRATMORE, Counter-claim-defendant-Appellee.
Richard D. SCHULTZ, Plaintiff,
v.
BATEMAN EICHLER, HILL RICHARDS, INC., et al., Defendants.
Frank L. BRYANT, Counter-claimant-Appellant,
v.
Richard L. SCHULTZ, Counter-claim-defendant-Appellee.
BATEMAN EICHLER, HILL RICHARDS, INC.; Robert J. McGuiness,
Counter-claimant-Appellant,
v.
Richard L. SCHULTZ, Counter-claim-defendant-Appellee.
Richard D. SCHULTZ, Plaintiff,
v.
BATEMAN EICHLER, HILL RICHARDS, INC., et al., Defendants.
Charles R. HEMBREE; Kincaid, Wilson, Schaeffer & Hembree,
P.S.C., Counter-claimants-Appellants,
v.
Richard L. SCHULTZ, Counter-claim-defendant-Appellee.
Blas R. CASARES, Plaintiff-counter-claim-defendant-Appellee,
v.
SPENDTHRIFT FARM, INC., Defendant,
and
Frank L. Bryant, Defendant-counter-claimant-Appellant.
Blas R. CASARES, Plaintiff,
v.
SPENDTHRIFT FARM, INC., et al., Defendants.
BATEMAN EICHLER, HILL RICHARDS, INC., a Delaware
corporation; Robert J. McGuiness,
Counter-claimants-Appellants,
v.
Blas R. CASARES, Counter-claim-defendant-Appellee.
Blas R. CASARES, Plaintiff,
v.
SPENDTHRIFT FARM, INC., et al., Defendants.
Charles R. HEMBREE; Kincaid, Wilson, Schaeffer & Hembree,
P.S.C., a Kentucky professional corporation,
Counter-claimants-Appellants,
v.
Blas R. CASARES, Counter-claim-defendant-Appellee.
John F. McGONIGLE; Virginia M. McGonigle, Plaintiffs,
v.
Leslie COMBS, II, et al., Defendants.
Frank L. BRYANT, Defendant-counter-claimant-Appellant,
v.
John F. McGONIGLE; Virginia M. McGonigle,
Counter-claim-defendants-Appellees.
John F. McGONIGLE; Virginia M. McGonigle, Plaintiffs,
v.
Leslie COMBS, II, et al., Defendants.
BATEMAN EICHLER, HILL RICHARDS, INC.; Robert J. McGuiness,
Defendants-counter-claimants-Appellants,
v.
John F. McGONIGLE; Virginia M. McGonigle,
Counter-claim-defendants-Appellees.
John F. McGONIGLE; Virginia M. McGonigle, Plaintiffs,
v.
Leslie COMBS, II, et al., Defendants.
Charles R. HEMBREE; Kincaid, Wilson, Schaeffer and Hembree,
P.S.C., Defendants-counter-claimants-Appellants,
v.
John F. McGONIGLE; Virginia M. McGonigle,
Counter-claim-defendants-Appellees.
Robert D. STRATMORE, Plaintiff,
v.
Leslie COMBS, II, et al., Defendants.
Garth GUY, Defendant-counter-claimant-Appellant,
v.
Robert D. STRATMORE, Counter-claim-defendant-Appellee.
Leslie COMBS, II, et al., Defendants,
and
Garth Guy, Defendant-counter-claimant-Appellant,
v.
George E. LAYMAN and George E. Layman, Jr., d/b/a Forest
Acres Partnership, a Washington general partnership; Barry
K. Schwartz and Calvin Klein d/b/a Barry K. Schwartz
Partnership, a New York general partnership; Earl H.
Schultz; and Kenneth Franzhein, II,
Counterclaim-defendants-Appellees.
Zenya YOSHIDA d/b/a Shadai Farm, Plaintiff,
v.
Brownell COMBS, II, et al., Defendants.
Garth GUY, Defendant-counter-claimant-Appellant,
v.
Zenya YOSHIDA d/b/a Shadai Farm, Counter-claim-defendant-Appellee.
John F. McGONIGLE; Virginia M. McGonigle, Plaintiffs,
v.
Brownell COMBS, II, et al., Defendants.
Garth GUY, Defendant-counter-claimant-Appellants,
v.
John F. McGONIGLE; Virginia M. McGonigle,
Counter-claim-defendants-Appellees.
Blas R. CASARES, Plaintiff,
v.
Brownell COMBS, II, et al., Defendants.
Garth GUY, Defendant-counter-claimant-Appellant,
v.
Blas R. CASARES, Counter-claim-defendant-Appellee.
Richard D. SCHULTZ, Plaintiff,
v.
Leslie COMBS, II, et al., Defendants.
Garth GUY, Defendant-counter-claimant-Appellant,
v.
Richard L. SCHULTZ, Counter-claim-defendant-Appellee.
HAMILTON PARTNERS, et al., Plaintiffs,
v.
Brownell COMBS, II, et al., Defendants.
Garth GUY, Defendant-counter-claimant-Appellant,
v.
HAMILTON PARTNERS, an Ohio general partnership; Frank E.
Fowler; James P. Coleman; Mercer Reynolds III; William O.
Dewitt, Jr.; Northwood Ventures; Peter G. Schiff; Gateway
Investment Partnership; Calvin Ingram,
Counter-claim-defendants-Appellees.
H. James GRIGGS, Plaintiff,
v.
Leslie COMBS, II, et al., Defendants.
Frank L. BRYANT, Defendant-counter-claimant-Appellant,
v.
H. James GRIGGS, Counter-claim-defendant-Appellee.
H. James GRIGGS, Plaintiff,
v.
Brownell COMBS, II, et al., Defendants.
Garth GUY, Defendant-counter-claimant-Appellant,
v.
H. James GRIGGS, Counter-claim-defendant-Appellee.
 Nos. 89-16621, 16622, 16623, 16641, 16642, 16644, 16646,
16647, 16648, 16650, 16651, 16657, 16658, 16660, 16665,
16666, 16667, 16670, 16674, 16675, 16680, 16684, 16686,
16688, 16690, 16692, 16696, 16698, 16726.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 13, 1991.
Decided Dec. 17, 1992.
As Amended on Denial of Rehearing and Rehearing En Banc May 12, 1993.
 
 James E. Burns, Jr., Kevin P. Muck, Suzanne D. Kay, Brobeck, Phleger & Harrison, San Francisco, CA, for defendants-counter-claimants-appellants Bateman Eichler, Hill Richards, Inc. and Robert J. McGuiness.
 Thomas K. Bourke, Donald J. Kula, Riordan & McKinzie, Los Angeles, CA, for defendant-counter-claimant-appellant Frank L. Bryant.
 M. Laurence Popofsky, Michael L. Rugen, Richard DeNatale, Heller, Ehrman, White & McAuliffe, San Francisco, CA, for defendants-counter-claimants-appellants Charles R. Hembree and Kincaid, Wilson, Schaeffer & Hembree, P.S.C.
 John I. Alioto, Michael J. Bettinger, Alioto & Alioto, San Francisco, CA, for plaintiffs-counter-claim-defendants-appellees George E. Layman and George E. Layman, Jr. d/b/a Forest Acres Partnership, Barry K. Schwartz and Calvin Klein d/b/a Barry K. Schwartz Partnership, Earl H. Schultz, Kenneth Franzhein, II, H. James Griggs, Zenya Yoshida d/b/a Shadai Farm, Robert D. Stratmore, Richard L. Schultz, John F. McGonigle and Virginia M. McGonigle.
 Richard M. Trautwein, Susan L. Williams, Alagia, Day, Marshall, Mintmire & Chauvin, Louisville, KY, for plaintiff-counter-claim-defendant-appellee Blas R. Casares.
 Appeal from the United States District Court for the Northern District of California.
 Before CANBY and KOZINSKI, Circuit Judges, and CARROLL,* District Judge.
 CANBY, Circuit Judge:
 
 
 1
 Certain defendants in McGonigle v. Combs, 968 F.2d 810 (9th Cir.1992), appeal the district court's summary judgment rejecting their counterclaim for attorneys' fees.[1] The counterclaim alleged that the defendants were entitled to recover their fees because the plaintiffs' breaches of certain warranties triggered an indemnification clause to which plaintiffs had agreed. In addition, defendant Frank Bryant appeals the district court's denial of his requests for attorneys' fees under Section 11(e) of the Securities Act of 1933, 15 U.S.C. § 77k(e) (1988), Rule 11 of the Federal Rules of Civil Procedure, and Rule 37(c) of the Federal Rules of Civil Procedure. We reverse and remand the district court's denial of Bryant's request for attorneys' fees under Section 11(e), and we affirm the district court's rejection of the remaining claims.
 
 
 2
 THE DEFENDANTS' CONTENTION THAT THE SUBSCRIPTION AGREEMENT
 
 ENTITLES THEM TO ATTORNEYS' FEES
 Factual Background
 
 3
 This counterclaim is one of many components of a complex securities litigation involving Spendthrift Farms, a thoroughbred horse breeder. Plaintiffs were investors in a private placement of Spendthrift stock; when the thoroughbred market declined, they sued a string of defendants, alleging a variety of fraudulent acts and omissions. The district court granted summary judgment for the defendants on most of the claims and directed a verdict on several others; the jury returned a complete defense verdict on the remaining claims. The merits of the lawsuit are considered in McGonigle v. Combs, and other related issues are treated in Schultz v. Hembree, 975 F.2d 572 (9th Cir.1992).
 
 
 4
 After the defendants prevailed on all counts, several of them--Frank Bryant; Robert McGuiness and his employer, the investment banker Bateman Eichler, Hill Richards, Incorporated; and Charles Hembree and his law firm, Kincaid Wilson, Schaeffer & Hembree, P.S.C.--pressed this counterclaim seeking reimbursement of the attorneys' fees they incurred. The basis of these defendants' counterclaim is a subscription agreement attached as an appendix to the Private Placement Memorandum ("PPM") for the private offering of shares in Spendthrift. Each of the plaintiffs signed the subscription agreement in the course of his or her purchase of shares in Spendthrift.[2] The subscription agreement contains, inter alia, twenty-two "representations and warranties" that occupy more than three pages of single-spaced type. These representations include, for example, that "it has been called to [the investor's] attention both in the [Private Placement] Memorandum and by those individuals with whom he has dealt in connection with his investment in the shares that his investment in the Company involves a substantial degree of financial risk," and that "[the investor] has received no representations or warranties from the Sellers or any of the Sellers [sic] officers, directors, employees or agents other than those contained in the [Private Placement] Memorandum." Each investor further warrants, among other things: that he has a net worth of at least $5,000,000 and is knowledgeable in financial matters; that he has read the PPM; that he understands that the shares are subject to restrictions on transfer; that he is not purchasing the shares with a view to resale; and that he will not sell or transfer his shares without providing the sellers with an unqualified opinion of counsel that the sale or transfer "complies with the 1933 Act and any applicable federal and state securities laws and regulations."
 
 
 5
 The subscription agreement also contains an indemnification clause, which states as follows:
 
 
 6
 5. Indemnification. The foregoing representations and warranties are made by the Subscriber with the intent that they may be relied upon in determining his qualification and suitability to purchase Shares, and the Subscriber hereby agrees that such representations and warranties shall survive his purchase thereof. The Subscriber hereby agrees to indemnify and hold harmless the Company, the Sellers and agents of each of them from and against any losses, claims, damages, liabilities, expenses (including attorneys' reasonable fees and disbursements), judgements and amounts paid in settlement resulting from the untruth of any of the warranties and representations contained herein, or the breach by the Subscriber of any of the covenants made by him herein. Notwithstanding the foregoing, however, no representation, warranty, acknowledgement or agreement by the Subscriber made herein shall in any manner be deemed to constitute a waiver of any rights granted to him under Federal or State securities laws.
 
 
 7
 The defendants argue that, in pursuing this litigation, the plaintiffs breached their warranties in the Subscription Agreement by averring, for example, that they relied on representations made by the defendants outside of the PPM and that they were misled into believing that their investment in Spendthrift entailed little risk. The defendants contend that, in light of those breaches, the indemnification clause obligates the plaintiffs to pay the defendants' attorneys' fees.
 
 Discussion
 
 8
 The material facts are not in dispute; the plaintiffs acknowledged for purposes of summary judgment that they breached certain provisions of the security agreement in bringing their lawsuit. The plaintiffs contend, however, that they are not obligated to reimburse the defendants for their attorneys' fees because the indemnification clause is limited to liability arising from breaches that cause the sellers to lose their private placement registration exemption under SEC Rule 506, 17 C.F.R. § 230.506 (1992), or comparable exemptions under state blue sky laws. The sellers have not lost any such exemption. Thus the only question before us is a straightforward one: Does the indemnification clause obligate the plaintiffs, who are assumed to have breached their warranties, to pay the attorneys' fees of the defendants that were incurred in defending the plaintiffs' unsuccessful claims?[3]
 
 The first page of the PPM states that
 
 9
 [t]he Sellers will impose certain standards which prospective investors must meet in order to be eligible to purchase the shares. These suitability standards are designed to assure compliance with Section 4(1) of the Securities Act of 1933 and Regulation D promulgated by the Securities and Exchange Commission thereunder and with the Blue Sky Laws of the states in which this offering will be made.
 
 
 10
 This concern that the offering meet all the requirements for a registration exemption is reflected in the representations and warranties of the subscription agreement, which--as both the plaintiffs and the defendants acknowledge--contain the "suitability standards" mentioned in the sentence above. As a result, many of the representations in the subscription agreement track, verbatim, the language of Regulation D.
 
 
 11
 More important for our purposes, the opening sentence of the indemnification clause focuses on the suitability standards: "The foregoing representations and warranties are made by the Subscriber with the intent that they may be relied upon in determining his qualification and suitability to purchase Shares, and the Subscriber hereby agrees that such representations and warranties shall survive his purchases thereof." This language indicates that the focus of the indemnification was on ensuring, first, that the suitability standards were met, so that the sellers could retain their private placement registration, and, second, that, if the registration were lost and damages resulted, the investor who caused the loss would be liable.
 
 
 12
 The defendants would have us focus on the second sentence of the indemnification clause, which states that
 
 
 13
 [t]he Subscriber hereby agrees to indemnify and hold harmless the Company, the Sellers and agents of each of them from and against any losses, claims, damages, liabilities, expenses (including attorneys' reasonable fees and disbursements), judgements and amounts paid in settlement resulting from the untruth of any of the warranties and representations contained herein, or the breach by the Subscriber of any of the covenants made by him herein.
 
 
 14
 The defendants point to the broad language of this sentence in support of their contention that the indemnification is not limited to a loss of the registration exemption, but rather applies to all losses that result from a breach of a representation or warranty--even losses arising from this suit brought by the indemnitors. It is true that this sentence, viewed in isolation, could be read so broadly. But this sentence does not appear in isolation. It immediately follows a sentence focusing on the suitability standards for a private placement exemption. The section of the document in which it appears focuses primarily on the suitability standards. The placement of the indemnification (i.e., immediately after the section on the suitability standards) gives no intimation of a broader purpose than to indemnify for liability arising from loss of the private placement exemption. Moreover, the first page of the PPM sets the stage by focusing on suitability standards. In light of this context, we conclude that the unambiguous[4] expressed intent of the clause is that any investor whose breach of a representation causes the sellers to lose their private placement exemption is obligated to reimburse the sellers for their losses. In our view, a reasonable investor who read the PPM and the subscription agreement would so interpret the indemnification clause.
 
 
 15
 This analysis comports with that of the leading case on the application of indemnification clauses, Zissu v. Bear, Stearns & Co., 805 F.2d 75 (2d Cir.1986). Zissu, like our case, involved a plaintiff who brought suit under the securities laws, alleging, among other things, that he had relied on certain oral misrepresentations. Id. at 76. As was the case here, Zissu had warranted in his subscription agreement that no oral representations had been made to him. Id. at 77. Furthermore, the indemnification clause in Zissu was similar to the one in this case, in that Zissu agreed to indemnify and hold harmless the sellers "against any and all loss, damage or liability due to or arising out of a breach of any representation or warranty" that he had made in the subscription agreement. Id. The clause in Zissu did not mention attorneys' fees, and the court underscored that omission, but the court's reasoning went beyond the mere presence or absence of the words "attorneys' fees":
 
 
 16
 The "any and all damages" clause of the Subscription Agreement in this case did not meet the requisite level of specificity necessary to hold Zissu liable to reimburse Encore and Bear Stearns for defense costs in their successful defense against Zissu's securities claims. The clause Zissu signed did not put him on notice that he would be responsible for defendants' legal fees incurred in the security fraud suit. In fact, no mention of attorney's fees was made in the indemnification clause. Instead, the warranties in question were necessary to exempt the limited partnership from the requirements of the 1933 Act and are so understood by investors. That being the case, the parties had little reason to expect that such warranties might also be the basis for the counterclaim made in the present case. Thus, although New York courts have held that contractual indemnity provisions for attorneys' fees will be enforced, and broad indemnification provisions like the one here should be read to extend to such fees, a higher level of specificity is required when attorneys' fees are being assessed against a plaintiff suing for securities fraud.
 
 
 17
 Id. at 79-80 (citations omitted).
 
 
 18
 Zissu thus focused on both the absence of any reference to attorneys' fees and the failure of the indemnification clause to put Zissu on notice that the clause was not limited to reimbursement for the loss of the registration exemption. The defendants suggest that the subscription agreement's reference to attorneys' fees renders Zissu inapplicable, but we disagree. Our reading of Zissu is that a reference to attorneys' fees is necessary but not sufficient; the crucial element of an indemnification is that it put potential investors on notice that the indemnification is not limited, and instead applies to fees and damages incurred in defending a claim brought by the subscribing indemnitor herself. The placement of the indemnifying language, as well as the language itself, must reveal its scope.
 
 
 19
 A person who contracts to pay an opponent's attorneys' fees if she sues unsuccessfully is agreeing to a departure from the standard American rule that a party prevailing in a lawsuit is not entitled to recover fees from the loser. See Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). It is not too much to ask that a clause effectuating such a deviation from the norm be explicit. The indemnification clause here is worded most peculiarly if its purpose was to shift fees in a 10b-5 case brought by the subscribing investor. The clause nowhere states that, if the investor breaches a warranty in suing the sellers, and loses, then the investor must pay the defendants' fees. Instead, it promises that the investor will indemnify the sellers from any losses, including attorneys' fees, arising from untruth of any of the warranties signed by the investor--warranties with the stated purpose of preserving the private placement exemption.
 
 
 20
 The defendants' position is that the expressed intent of the parties, as literally set forth in the indemnification clause, was to force the investors to reimburse the sellers for all costs and liability resulting from any breach of the representations and warranties. The language thus encompasses this case, they argue. But if the indemnity clause is so interpreted to apply to the plaintiffs' lawsuit for oral misrepresentations, its literal terms would require the plaintiffs to pay the defendants' judgment and attorneys' fees even if plaintiffs prevailed! In our view, the absurdity of such a result--an investor would have a meaningless right to sue, because she would have to pay the judgment and fees of the losing sellers--undermines the reasonableness of the defendants' interpretation of the indemnification.
 
 
 21
 The defendants respond by pointing out that Section 29 of the Securities Act of 1934, 15 U.S.C. § 78cc (1988) (and its counterpart in the 1933 Act, Section 14, 15 U.S.C. § 77n (1988)) would prohibit a culpable defendant from recovering his losses from the indemnitor plaintiff, thereby eliminating the danger of a successful investor having to reimburse herself. This argument misses the point. We do not suggest that courts would, in fact, require a successful investor litigant to pay her own recovery. The point is simply that, read as the defendants urge, the clause would seem to require that absurd result. That fact suggests to us that the indemnification clause cannot be given the broad reading that the defendants urge. It further suggests that a reasonable investor would not so interpret the language in agreeing to the clause.[5]
 
 
 22
 In light of these considerations, we conclude that the indemnification required by the clause in this case does not extend to fees or damages incurred in defending claims brought by the subscribing indemnitor. We therefore affirm the district court's refusal to award attorneys' fees under this clause.
 
 
 23
 BRYANT'S CHALLENGE TO THE DISTRICT COURT'S REFUSAL TO AWARD
 
 
 24
 FEES UNDER SECTION 11(e) OF THE SECURITIES ACT OF
 
 1933 AND RULES 11 AND 37(c) OF THE
 FEDERAL RULES OF CIVIL PROCEDURE
 
 25
 In addition to joining the main counterclaim, defendant Frank Bryant brought a counterclaim for his attorneys' fees based on Section 11(e) of the Securities Act of 1933, 15 U.S.C. § 77k(e), Rule 11 of the Federal Rules of Civil Procedure, and Rule 37(c) of the Federal Rules of Civil Procedure.[6]
 
 
 26
 I. Bryant's Request for Attorneys' Fees Under Section 11(e)
 
 
 27
 Section 11(e) of the Securities Act of 1933 allows the district court to award attorneys' fees if it "believes the suit or the defense to have been without merit." 15 U.S.C. § 77k(e). "The 'without merit' standard ... encompasses claims and defenses that ... border on the frivolous." Western Federal Corp. v. Erickson, 739 F.2d 1439, 1444 (9th Cir.1984) (emphasis added). In its ruling on the defendants' requests for attorneys' fees, the district court stated that, "with respect to some of the claims against Mr. Bryant, McGuiness, [and] Central Bank, that they were--bordered on frivolous." The district court did not award Bryant attorneys' fees under Section 11(e), however, stating that "[w]ith respect to Section 11(e), the standard announced by the 9th Circuit is ... frivolous and brought in bad faith.... I didn't think that these claims fall within that category." As Bryant correctly points out, the district court applied an incorrect legal standard to his request for attorneys' fees; the court apparently believed that it had the discretion to award fees only if the claims against Bryant were frivolous, when in fact it could award fees for those that merely bordered on the frivolous. In light of this error, we remand for a determination of which claims bordered on the frivolous, and we direct the district court to consider awarding Bryant the attorneys' fees he incurred in defending against those claims.[7]
 
 
 28
 II. Bryant's Request for Attorneys' Fees Under Rule 11
 
 
 29
 Bryant suggests that the district court applied an erroneous legal standard in rejecting his request for attorneys' fees under Rule 11 of the Federal Rules of Civil Procedure. He states that the district court applied the standard articulated in the panel decision of Townsend v. Holman Consulting Corp., 881 F.2d 788, 795 (9th Cir.1989) (Rule 11 sanctions appropriate only when all claims against all parties are frivolous), and that the district court's alleged reliance on Townsend constituted reversible error in light of the en banc court's rejection of the panel's opinion. Townsend v. Holman Consulting Corp., 929 F.2d 1358 (9th Cir.1990) (en banc) (frivolous claims can be sanctioned even if pleading contains non-frivolous claims). The problem with Bryant's argument is that we have no reason to believe that the district court relied on the Townsend panel decision. The district court, in rejecting Bryant's Rule 11 request for fees, correctly outlined the standard for awarding fees under Rule 11 (omitting any reference to a requirement that all claims must be frivolous) and then stated that "I don't think that any of the claims made here rise to that level." The court's use of "any" indicates that it did not apply the Townsend panel's ruling, and that it concluded that each of the claims was neither frivolous nor brought for an improper purpose. The court did not abuse its discretion in so concluding. We therefore reject Bryant's challenge to the district court's refusal to award fees under Rule 11.
 
 
 30
 III. Bryant's Request for Attorneys' Fees Under Rule 37(c)
 
 
 31
 Bryant asserts that the district court applied an incorrect legal standard in refusing to award him fees under Rule 37(c) of the Federal Rules of Civil Procedure; he suggests that the district court followed the plaintiffs' erroneous contention that they could not be penalized for their refusal to admit ultimate issues of fact. Bryant misreads the district court's ruling. The district court did not indicate that it adopted the plaintiffs' position, nor did it appear to follow an incorrect legal standard. We find no abuse of discretion in the court's ruling. We therefore reject Bryant's contention that the district court erred in refusing to award attorneys' fees under Rule 37(c).
 
 CONCLUSION
 
 32
 We affirm the district court's refusal to grant attorneys' fees under the indemnification clause of the subscription agreement. We also affirm the district court's denial of Bryant's request for attorneys' fees under Rules 11 and 37(c) of the Federal Rules of Civil Procedure. We remand to the district court Bryant's request for attorneys' fees under Section 11(e) of the Securities Act of 1933, so that the court can apply the proper standard.
 
 
 33
 All parties except defendant-appellant Bryant are to bear their own costs on this appeal. Bryant is entitled to recover his costs from plaintiffs.
 
 
 34
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 35
 KOZINSKI, Circuit Judge, dissenting for the most part:
 
 
 36
 The right to make contracts is more than just a socially useful convention; it's an important aspect of personal autonomy. By contract, we can order some of the most important aspects of our existence: housing, health care, education, the pursuit of a profession or vocation, sometimes even marriage. Having the power to bind ourselves in exchange for similar concessions from others gives us a significant measure of control over our lives.
 
 
 37
 Signing a contract does not, of course, guarantee we will be better off. A system of mutual, free exchange gives us only the opportunity to better ourselves; business acumen, diligence and luck will affect the final tally. The right to contract therefore means the right to take chances, to play hunches, to make mistakes; it means having to live by our decisions, no matter how they turn out: "Wise or not, a deal is a deal." United Food & Commercial Workers Union v. Lucky Stores, Inc., 806 F.2d 1385, 1386 (9th Cir.1986).
 
 
 38
 While my colleagues don't quarrel with these principles, they do much to undermine them. Confronted with a contract clause they find unpalatable, they refuse to enforce it under the guise of interpretation. But the reasons they offer are not merely unpersuasive; they're transparent. The clause in question says precisely what the sellers claim: It entitles them to attorney's fees for litigation arising out of misrepresentations by the subscribers as to what they did and did not rely on. Reasonable minds can differ as to whether such a clause violates public policy; I believe it does not, but the contrary view is certainly defensible. See pp. 1357-58 infra. Less defensible is ducking the issue by twisting the law of contract beyond recognition. Because I cannot agree with the majority's result, and because I see nothing but mischief growing from the way it gets there, I dissent from all but minor portions of the opinion.
 
 
 39
 A. We must decide whether the following language in the subscription agreement means what it says:
 
 
 40
 The Subscriber hereby agrees to indemnify ... the Sellers ... against any losses, claims, damages, liabilities, expenses (including attorneys' reasonable fees and disbursements) ... resulting from the untruth of any of the warranties and representations contained herein, or the breach by the Subscriber of any of the covenants made by him herein.
 
 
 41
 The majority concedes that "viewed in isolation" this provision could expose the subscribers to liability for the sellers' attorney's fees. Maj. op. at 1351. It's hard to reach any other conclusion:
 
 
 42
 (1) The subscribers made several warranties, among them that they wouldn't rely on any oral representations in entering the agreement.
 
 
 43
 (2) They then brought this lawsuit claiming that they in fact did rely on oral representations.
 
 
 44
 (3) The sellers were required to defend the lawsuit at considerable expense because the subscribers lied when they warranted they wouldn't rely on oral representations.
 
 
 45
 (4) The indemnity clause holds sellers harmless for losses "including attorney's reasonable fees and disbursements ... resulting from the untruth of any of the warranties."
 
 
 46
 (5) The sellers' expenses (consisting largely of attorney's fees) seem to be exactly what the quoted language covers.
 
 
 47
 Q.E.D.
 
 
 48
 Recognizing that the quoted language "could be read so broadly," id., the majority nonetheless concludes that it unambiguously provides the contrary. Indeed, "no rational trier of fact could attribute to the clause the [contrary] meaning urged by the defendants." Id. at n. 3. The majority thus holds that a trier of fact would have to be drunk or crazy to construe the contract to mean what it says.
 
 
 49
 California law is just the opposite. If the language of a contract is susceptible to two different meanings, each side is entitled to put on evidence supporting its preferred construction. See, e.g., Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., 69 Cal.2d 33, 37, 69 Cal.Rptr. 561, 442 P.2d 641 (1968). Even if the language seems susceptible to only one meaning, a party may still put on evidence that a second meaning reflects the parties' actual intent. Id. at 39-40, 69 Cal.Rptr. 561, 442 P.2d 641; see also Brinderson-Newberg Joint Venture v. Pacific Erectors, Inc., 971 F.2d 272, 276-77 (9th Cir.1992) (following Pacific Gas ). I don't understand how we can deny the sellers a trial to prove that the parties in fact intended that the clause "be read so broadly." Maj. op. at 1351.
 
 
 50
 B. But why does the majority so categorically reject the plain language of the contract? The indemnification clause follows language, the majority explains, which suggests the warranties were made to ensure compliance with the private placement exemption to the federal securities laws. Maj. op. at 1351. For example, each subscriber agreed not to transfer his shares, as required by Rule 506, the exemption relied on here. See 17 C.F.R. §§ 230.506, 230.502(d). Assuring compliance with the securities laws was no doubt the reason for some of the warranties.
 
 
 51
 Many other warranties do not track the rule, however. Investors in private placements need only be worth $1 million, whereas each subscriber here warranted he had a net worth of at least $5 million. Id. § 230.501(a)(5). The subscribers also said they understood the financial statements were unaudited, even though the SEC rules don't require audited statements for Rule 506 offerings, nor any such warranties by subscribers. Id. § 230.502(b). Similarly, each investor warranted he had read the offering memorandum, and that the books and accounts of the company were available to him; the regulations state that "[t]he issuer is not required to furnish [such information] to any accredited investor," id. § 230.502(b)(1), which all of these subscribers were. Clearly the sellers sought and obtained warranties beyond those required by the securities laws.
 
 
 52
 Most telling is the warranty at issue here--that the subscribers weren't relying on representations made outside the offering materials. One searches in vain for this requirement in Rule 506 or anywhere else in the securities laws. How does this dovetail with the majority's conclusion that the warranties served no purpose other than to protect the private placement exemption? What becomes of this warranty under the majority's approach? Are we free to interpret the contract--and declare that no rational trier of fact could do otherwise--so as to render this warranty a nullity?
 
 
 53
 Left to my own devices, I'd just read the disputed language as written. But if we're going to triangulate the meaning of the indemnity clause by reference to neighboring clauses, surely we must look at all such clauses. The majority does the sellers an injustice by failing to even acknowledge these other provisions.
 
 
 54
 C. The majority also maintains the indemnity provision wasn't specific enough to put the subscribers on notice. See Maj. op. at 1351-52. It relies on Zissu v. Bear, Stearns & Co., 805 F.2d 75, 79-80 (2nd Cir.1986), for the proposition that the subscribers weren't fairly apprised they could be liable for attorney's fees if their securities suit was unsuccessful. But the indemnity clause at issue in Zissu only provided for indemnity "against any and all loss, damage or liability due to or arising out of a breach of any representation or warranty." Id. at 77 (emphasis supplied by Zissu ). Accordingly, Zissu refused to enforce the agreement because "no mention of attorneys' fees was made in the indemnification clause." Id. at 79. The Second Circuit left room for the use of such a clause, but held that "a higher level of specificity is required when attorneys' fees are being assessed against a plaintiff suing for securities fraud." Id. at 80.
 
 
 55
 Here we have just such a higher level of specificity: Every subscriber agreed to indemnify the sellers "from and against any losses, claims, damages, liabilities, [and] expenses (including attorneys' reasonable fees and disbursements ) ... resulting from the untruth of any of the warranties" (emphasis added). The lack of notice that troubled the Second Circuit in Zissu just isn't a problem here. See Barnebey v. E.F. Hutton & Co., 715 F.Supp. 1512, 1519-22 (M.D.Fla.1989).
 
 
 56
 More fundamentally, I question the majority's solicitude for these subscribers. These weren't mom and pop investors who mortgaged their retirement to buy palladium mines in Zanzibar. They weren't forced into the contract by economic duress; they weren't badgered by salesmen who pounded down their doors on Saturday morning. These were seasoned business people who commanded considerable resources. Many of them had substantial experience with horse breeding; some had already been doing business with Spendthrift.[1] Most retained independent investment advisers and lawyers, and took their sweet time buying into the deal.[2] They risked what they warranted were disposable resources, hoping to get even richer. They gambled--and they lost.
 
 
 57
 Under these circumstances, what on earth does it mean to say the subscribers didn't have notice of the attorney's fee indemnity clause? It's axiomatic that a contract gives its signatories notice of what it says. We may blunt the cutting edge of this principle when one of the parties is illiterate, or subject to economic duress, or when we see legal filigree buried deep within a long, printed contract. But what justifies departing from this principle here? If these subscribers can't be held to the terms of the contract they signed, who ever can?
 
 
 58
 D. We get a glimpse of what animates the majority's legal aerobics in the part of the opinion where they dispatch the sellers' suggested interpretation: "But if the indemnity clause is so interpreted to apply to the plaintiffs' lawsuit for oral misrepresentations, its literal terms would require the plaintiffs to pay the defendants' judgment and attorney's fees even if plaintiffs prevailed!" Maj. op. at 1352. The majority twice describes this as an absurd result, but nowhere really explores the issue. Which is too bad, because this is the meat of the coconut--the difficult public policy question at the heart of this dispute.
 
 
 59
 Before addressing this issue, however, I note that the majority does more than interpret the contract. By twice labelling the result suggested by the sellers as "absurd," the majority is saying it wouldn't enforce the clause even if the contract clearly and unambiguously provided what the sellers claim it does, and even if it gave ample notice to the subscribers. An absurd result, after all, remains absurd even if it's explicitly enshrined in the contract. The majority thus writes off what might be a perfectly acceptable and useful provision in a private placement agreement without even a close look. It would be far better if the majority confronted the issue squarely.
 
 
 60
 The majority's error begins and ends with its phrasing of the issue. After all, if you assume a securities law violation, it makes no sense to suggest that a defrauded plaintiff will have to indemnify the defrauding defendant by paying back the 10b-5 judgment plus attorneys' fees. But the whole purpose of a provision like the one we are construing is to forestall a 10b-5 violation by limiting the information the investors rely on. Properly framed, the critical question here is: May sophisticated, well-counselled parties, using disposable assets, dealing at their leisure and from arms' length, limit by contract what information they will consider in making a major investment?
 
 
 61
 A perfectly respectable argument can be made that such a provision runs afoul of section 29(a) of the Securities Exchange Act of 1934, which states that "[a]ny condition, stipulation, or provision binding any person to waive compliance" with the federal securities laws and regulations is void. 15 U.S.C. § 78cc(a); see also id. § 77n. Enforcement of the indemnity provision could be seen as a waiver of the securities laws because it bars securities lawsuits based on misstatements of fact not contained in the offering materials. Rule 10b-5, after all, prohibits "any untrue statement of a material fact ... in connection with the purchase or sale of any security," not merely those made in the private placement memorandum. 17 C.F.R. § 240.10b-5 (emphasis added). Giving effect to the indemnity clause might prevent a meritorious securities action based on misrepresentations made by the promoters orally or in writings outside the formal offering package. An indemnity clause could thus be viewed as an end-run around the securities laws.
 
 
 62
 In fact, it's the very opposite. The whole point of requiring a written prospectus that conforms to the SEC's precise guidelines, see Reg.D, 17 C.F.R. §§ 230.501-.508, is to ensure that the parties rely on unbiased written data, not on half-whispered oral representations. Letting parties warrant that they are relying only on those offering materials serves this policy admirably: It forces potential subscribers to look closely at the written materials and avoids the ambiguity and claims of fraud inevitably fostered by collateral oral promises. The warranty, moreover, focuses on reliance, the key element in establishing liability under Rule 10b-5. See Basic, Inc. v. Levinson, 485 U.S. 224, 243, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988) (misstatements lead to liability only if they're relied on); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 206, 96 S.Ct. 1375, 1387, 47 L.Ed.2d 668 (1976) (same). Reliance is, by its nature, subjective; it's easily fabricated or distorted, particularly after the deal sours. Letting parties agree about what they will and will not consider in making a sophisticated, face-to-face securities investment would avoid the cost, uncertainty and delay of securities litigation that now turns on inherently unknowable mental processes.
 
 
 63
 Much is at stake here for everyone involved. This litigation--although it resulted in a complete defense victory, mostly on summary judgment--devoured a staggering quantity of productive resources. The record consists of 50 cubic feet of paper and weighs over half a ton. There were 4500 entries in the docket sheets below, including almost 400 orders and rulings by the district court. Fifty-seven briefs, consisting of nearly 1800 pages, were filed on appeal, yielding three published opinions. See Schultz v. Hembree, 975 F.2d 572 (9th Cir.1992); McGonigle v. Combs, 968 F.2d 810 (9th Cir.1992). Some 200 attorneys contributed to this conflagration, supported by legions of paralegals, summer associates and other staff. The attorneys' fees, for the seven defendants who requested them, amounted to more than $3.5 million. This says nothing of the fees incurred by the 13 plaintiffs and the 14 defendants who didn't request reimbursement; it doesn't take into account other litigation expenses such as photocopying, telephone, facsimile and messenger charges; deposition transcripts; airfares, limousines and hotel rooms; power meals in swank restaurants. See generally Lisa Gibbs, Skadden Calls Fee Routine; Florida Calls It Gouging, American Lawyer, July/Aug.1991, at 19 (billing dispute involving, among other things, a $17 fee for courier delivery of a 75-cent newspaper).
 
 
 64
 Chasing down ephemeral oral representations may be great fun for the lawyers--and so profitable, too--but it does nothing to ensure the integrity or regularity of our securities markets. To the contrary, fear of this type of scorched earth litigation--the juridical equivalent of the firebombing of Dresden--will only discourage people like the sellers from entering into such transactions. That the plaintiffs were able to inflict major financial damage on their adversaries, using as their launch vehicle a case so thin it was never allowed to reach the jury,[3] will surely send a chill down the spine of anyone contemplating selling securities--or engaging in any other type of business--in our litigation-minded society. Assuming, as we must, that our national interest is served when financial markets function efficiently, unbeclouded by the risk of kamikaze litigation, a clear statement that we will enforce a subscriber's warranty he hasn't considered matters outside the offering materials would have an entirely salutary effect.
 
 
 65
 Doing so would inflict no injustice. The subscribers were sophisticated and obviously wielded substantial bargaining power. They got legal and financial advice galore before committing to the deal. See nn.1-2 supra. Had they relied on oral representations made by the sellers, they could (and should) have said so before the money was paid and the securities delivered. See Henry Klehm III, Comment, Contractual Shifting of Defense Costs in Private Offering Securities Litigation, Y136 U.Pa.L.Rev. 971, 998-1002 (1988). I see no reason in the language or policies of the securities laws to make for them a softer bed than they've made for themselves.
 
 
 66
 That's why the majority's twice-asserted declaration of absurdity is entirely beside the (exclamation) point. Of course it would violate public policy, as well as the express terms of section 29(a), for parties to agree to pay back any damages they suffer under the securities laws. But it isn't nearly so absurd--indeed it makes considerable sense--to let parties limit by contract what they will and will not take into account when negotiating sophisticated financial transactions. The majority dismisses a lawful and potentially beneficial device by the use of a punctuation mark.
 
 Conclusion
 
 67
 I agree that the district court applied an incorrect legal standard in ruling on Frank Bryant's request for attorneys' fees pursuant to section 11(e) of the Securities Act of 1933; accordingly, I concur in remanding for a determination of which claims the district court believes bordered on the frivolous. I also agree that the district court didn't abuse its discretion in refusing to award Bryant fees under Fed.R.Civ.Proc. 11 and 37(c). But I strongly disagree with, and therefore dissent from, everything else in the majority opinion.
 
 
 
 *
 The Honorable Earl H. Carroll, United States District Judge for the District of Arizona, sitting by designation
 
 
 [1]
 Defendant Frank Bryant also claims certain other damages arising from the plaintiffs' breach of warranties, which he asserts are covered by the indemnity clause
 
 
 [2]
 Investor Blas Casares contends on appeal that he did not sign the agreement until after the stock was issued in his name, and, therefore, that he is not bound by the indemnity provision. In light of our affirmance of the district court's ruling, we do not reach the question whether Casares was bound by that provision
 
 
 [3]
 Because none of the parties suggests that we apply any particular state's substantive law, we apply the law of the forum state, California. Under California law, a court interpreting a contract should "look for expressed intent, under an objective standard." 1 B.E. Witkin, Summary of California Law Contracts § 684 (9th ed. 1987); accord Stevenson v. Oceanic Bank, 223 Cal.App.3d 306, 272 Cal.Rptr. 757, 763 (Cal.Ct.App.1990)
 
 
 [4]
 The defendants contend that, at most, the clause is ambiguous because the literal language of the indemnity clause can be read to cover this case. They assert that summary judgment is therefore improper. We find no ambiguity, but in any event we conclude, for reasons set forth in the text of our opinion, that no rational trier of fact could attribute to the clause the meaning urged by the defendants
 
 
 [5]
 Atari Corp. v. Ernst & Whinney, 981 F.2d 1025, 1031 (9th Cir.1992) (amended opinion), is clearly distinguishable. There the clause in question indemnified "all present and former officers and directors of the Company to the fullest extent permitted by applicable law with respect to all acts and omissions arising out of such individuals' services as officers, directors or employees of the Company or any of its subsidiaries." Nothing in the context narrowed the immense sweep of the indemnifying language. The clause was accordingly held to cover losses caused by an action brought by the indemnitor. In our case, as we explain in the text, the context discloses a narrower purpose
 
 
 [6]
 "We review the district court's rulings on Rule 11 issues under an 'abuse of discretion' standard." Townsend v. Holman Consulting Corp., 929 F.2d 1358, 1365-66 (9th Cir.1990) (en banc). In addition, we review a district court's decision whether or not to award attorneys' fees for abuse of discretion. Lange v. Penn Mutual Life Insurance Co. 843 F.2d 1175, 1184 (9th Cir.1988); Falstaff Brewing Corp. v. Miller Brewing Co., 702 F.2d 770, 784 (9th Cir.1983). "However, a district court abuses its discretion if it rests its conclusion on an erroneous legal premise, and questions of law are reviewed de novo." FSLIC v. Sahni, 868 F.2d 1096, 1097 (9th Cir.1989); see also Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405, 110 S.Ct. 2447, 2460, 110 L.Ed.2d 359 (1990); Cunningham v. County of Los Angeles, 879 F.2d 481, 487 (9th Cir.1988), cert. denied, 493 U.S. 1035, 110 S.Ct. 757, 107 L.Ed.2d 773 (1990)
 
 
 [7]
 Bryant also challenges the district court's finding that the plaintiffs' claims against him were not frivolous. Bryant does not point to any error of law but rather disputes the district court's conclusion that, though some claims bordered on the frivolous, none of them were frivolous. We conclude that the district court did not abuse its discretion in so finding
 
 
 [1]
 Typical is Robert Stratmore, an attorney who specialized in equestrian law and transactions, who grossed more than $15 million in thoroughbred trading the year of the Spendthrift offering and who holds lifetime breeding rights to Triple Crown winner Seattle Slew. See VII Joint ER, tab 20, exh. Q, at 149, 192. As defendants point out in their briefs, other subscribers included international fashion mogul Calvin Klein; Zenya Yoshida, Japan's largest and most prominent horse breeder; and the Layman family, who has been involved with thoroughbred horses for over thirty years. See Defendants' Brief at 8 & n. 4
 
 
 [2]
 For example, Barry Schwartz asked his lawyer and investment advisor, Ralph Finerman, to review the PPM. IV Joint ER, tab 19, exh. D, at 20, 99, 103. Attorney Finerman holds a masters degree in taxation and is a CPA. Id. at 12. Finerman first heard about the Spendthrift placement on June 20, 1983, and began reviewing the documents the next day. Id. at 99, 103. Finerman carefully studied the agreement, id. at 103, and had several conversations with persons at Spendthrift about the deal, id. at 104-05. Finerman discussed the fruits of his research thoroughly with Schwartz before advising him to sign onto the deal. Id. at 118. Although Finerman made an initial, tentative decision around July 1st, 1983, VIII Joint ER, tab 22, exh. I, at 144, Schwartz didn't sign the agreement until July 13, 1983, three weeks after first receiving it. I Joint ER, tab 4, at 3. See also V Joint ER, tab 20, exh. F (George E. Layman, Jr., reviewed the deal with both an attorney and an accountant); IV Joint ER, tab 19, exh. E (Earl Schultz had two legal advisors, as well as the legal department of one of his companies, review the transaction before signing); VI Joint ER, tab 20, exh. P (Zenya Yoshida's attorney approved the deal)
 
 
 [3]
 The case of Frank Bryant, a Spendthrift consultant, is particularly alarming. His defense was that he joined Spendthrift after the sale of the shares and was not in any way involved in the conception or drafting of the PPM. See e.g., X Joint ER, tab 28 (Declaration of Frank L. Bryant in Support of his Motion for Summary Judgment or Summary Adjudication of Issues). Defending on this theory, and winning summary judgment, Bryant was nonetheless saddled with approximately $900,000 in legal fees. See Declaration of Thomas K. Bourke in Support of Bryant's Motion for Award of Attorney's Fees from Casares and Schultz at 3-4. If this is the face of victory, how much uglier could defeat be?