[No. E015539. Fourth Dist., Div. Two. July 26, 1995.]

GLEN LUDWIG, Petitioner, v.
THE SUPERIOR COURT OF RIVERSIDE COUNTY, Respondent;
CITY OF BARSTOW et al., Real Parties in Interest.

COUNSEL

Cummings & Kemp, Brian J. Simpson, Everett L. Skillman and Clive J. Kemp for Petitioner.

No appearance for Respondent.

Latham & Watkins, Dorn G. Bishop, Christopher Garrett, Smith, Silbar, Duffy & Parker and Keith M. Parker for Real Parties in Interest.

OPINION

RICHLI, J.—Petitioner Glen Ludwig, defendant in the action below, seeks a writ of mandate to compel the trial court to grant his special motion to strike under Code of Civil Procedure section 425.16.[1] We conclude that real party the City of Barstow[2], plaintiff below, has failed to show a "probability" of success on the merits within the scope of the statute, and that the trial court therefore erred in denying Ludwig's motion. We will grant the relief prayed.

[1] All subsequent undifferentiated statutory references are to the Code of Civil Procedure.

[2] Additional plaintiffs and real parties are Barstow Investment "D" Limited Partnership, Barstow Investment "E" Limited Partnership, and Daniel Plies. For clarity, we will refer to Barstow as the sole real party, as it is Barstow which is obviously carrying the underlying litigation. We note at this point that none of the other plaintiffs/real parties were named as defendants in the two lawsuits which we discuss below. These plaintiffs/real parties apparently owned property which was a potential location for a discount mall in Barstow, and were interested in attracting a developer who would purchase the property.

## STATEMENT OF THE CASE

In a nutshell, petitioner Ludwig wishes, or has wished, to develop a discount mall in or near the Cities of Hesperia or Adelanto, and has taken at least preliminary steps to do so. Barstow, in turn, hoped to attract a discount mall of its own. Due to the geographic proximity of the locations, and their situation along the same transportation corridor, it would be economically advantageous for *either* mall not to face competition from the *other*. As a result, Ludwig, who apparently had the initial edge, was naturally concerned when the prospect of a competing mall in Barstow arose.[3] As a result, Ludwig took certain actions which became the subject of this litigation.

Barstow's first amended complaint sets forth causes of action for interference with contractual relations, interference with prospective economic advantage, and unfair competition. It sets forth Ludwig's supposed misdeeds in considerable detail, which we will summarize.

After a developer (Tanger Properties) had conditionally agreed to purchase property in Barstow for the development of a mall, one Clyde Sweet appeared at a public city council meeting and opposed the Tanger project. Thomas Keating then filed a lawsuit challenging the project, which the complaint characterizes as "meritless." When Barstow attempted to take Ludwig's deposition in this action, Ludwig "sought to block the depositions" and subsequently failed to appear as allegedly promised. Ludwig was otherwise uncooperative with Barstow's efforts to ascertain whether he was "behind" the litigation.

Keating and Barstow then settled the litigation.

Wayne Hendrix then appeared at another public meeting and requested that additional hearings be held on the Tanger project.

Sheree Krier then filed an action under the California Environmental Quality Act (CEQA) challenging Barstow's adoption of a negative declaration for the Tanger project. Krier later dismissed the action in return for the payment by Barstow of at least $75,000; Barstow, as part of the settlement, asserted that Krier's claims had no merit and had been brought for harassment purposes.

The record as later developed indicates that the Keating lawsuit was dismissed with a mutual cost waiver. Barstow also agreed to recirculate the

---

[3]Ludwig has conceded that he encouraged the activities of Keating, Krier, Hendrix, and Sweet, as discussed below. Whether his motives were altruistically environmental, or selfishly financial, is in the end irrelevant to our analysis. We will assume, for the purposes of this opinion, that Ludwig was concerned for the viability of his own project.

negative declaration previously prepared, and in return Keating agreed not to further oppose the Tanger project. Barstow also promised that it would not proceed with its "Reimbursement Agreement" with Tanger until "environmental analysis . . . has been completed."

The Krier settlement obligated Barstow to prepare an "updated Master Environmental Assessment" at a cost of at least $35,000 ($15,000 payable to a named "environmental attorney" who happened to be Krier's attorney), to create an "environmental advocacy fund" with a contribution of at least $30,000, evidently to go primarily to Krier or her attorney, and to pay her attorney fees of $10,000.

Barstow's position was that the Krier settlement was prompted by the imminency of a crucial deadline with Tanger Properties; that is, if the Krier litigation was not settled, Tanger would withdraw. Barstow "allowed" Keating to voluntarily dismiss his action in order to avoid the costs and delays which would have been involved in seeking a formal dismissal, which it could have done if Ludwig (and certain of his agents) refused to appear for depositions once the trial court had denied their motions for protective orders.[4]

The trial court denied the motion, apparently on the ground that the litigation promised good sport.[5]

Ludwig's motion to strike, and Barstow's opposition, generated a large amount of paperwork. Our acceptance of the propositions that Ludwig was

---

[4]It is, of course, far from obvious that the trial court would have dismissed Keating's lawsuit because Ludwig et al. failed to appear for their depositions. Whether Ludwig was "behind" the litigation had no relevance to its merits.

Ludwig *did* refuse to appear after the settlement was made. Barstow argued below that his appearance was a term of the settlement. No such term is apparent, and Keating would have no authority to bind Ludwig. However, until the action was actually dismissed, Ludwig was presumably under a legal obligation to comply with any properly served subpoena.

[5]Just prior to taking the case under submission, the court remarked "You know, when two groups of people come in and they're both so convinced, so righteous in their position, you hate to take those cases away from the jury, because they so enjoy determining which side that's so righteous is really correct."

Earlier in the hearing, the trial court percipiently observed to Ludwig's counsel "I think you're going to file a Cross-Complaint . . . ." We are informed that this is the case. The trial court also pointedly observed that ". . . both sides think you're going to get it both ways. You both essentially say one thing out of one side of your mouth and something else out of the other side of your mouth, and you know you're doing it." Although we conclude that the trial court should not have allowed this dispute to remain in court, we entirely share his view of the parties' positions. At the same time that he seeks to have this court throw out Barstow's interference complaint against him, Ludwig is pressing a similar suit based on Barstow's efforts to raise environmental objections to the Adelanto/Hesperia project. Presumably Barstow, asserting here that this action is viable, is resisting Ludwig's cross-complaint on the basis that *its* actions were entirely justifiable.

behind the opposition to the Tanger project and that his opposition was based on self-interest makes it unnecessary to detail the evidence adduced any farther than we have done.[6]

## DISCUSSION

### I.

We turn first to the statute on which Ludwig relied.

Section 425.16 was enacted to serve a specific purpose, which, happily if unusually, the Legislature explicitly set forth in subdivision (a): ". . . there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process." Accordingly, any "cause of action against a person *arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution in connection with a public issue* shall be subject to a special motion to strike. . . ." (Subd. (b), italics added.) If the statute applies, the plaintiff must establish, through the pleadings or affidavits, a "probability" that it will prevail. The special motion to strike is to be filed within 60 days of the service of the complaint, or later in the court's discretion. (Subd. (f).)

The history behind the enactment of section 425.16 has been explained in *Wilcox* v. *Superior Court* (1994) 27 Cal.App.4th 809, 815-819 [33 Cal.Rptr.2d 446], and we need not repeat the explication in its particulars. The statute was a response to the pervasive use of "SLAPP suits"[7] to discourage citizens from seeking governmental action. As noted in *Wilcox*, the "paradigm" SLAPP suit is an action filed by a land developer against environmental activists or objecting neighbors of the proposed development. However, as the court noted, "SLAPP's . . . are by no means limited to

---

[6]It is therefore unnecessary for us to rule on the propriety of Barstow's request that we take judicial notice of statements made by another Ludwig ally, Robert Hammock, at a deposition which followed the hearing on this motion. It may be seriously doubted whether this court could judicially notice Hammock's statements for their truth. (See *Sosinsky* v. *Grant* (1992) 6 Cal.App.4th 1548, 1564 [8 Cal.Rptr.2d 552] and cases cited.) We might accept it as "new evidence" under Code of Civil Procedure section 909 and California Rules of Court, rule 23—authorities not cited by Barstow. However, the matter is moot because we accept that Hammock did act at Ludwig's behest and for private purposes.

We do take judicial notice of the existence of Ludwig's claim for damages against Barstow, although we do not find it significant as a matter of law.

[7]"Strategic Lawsuits [or Litigation] Against Public Participation."

environmental issues . . . nor are the defendants necessarily local organizations with limited resources." (27 Cal.App.4th at p. 815.) The statute is appropriately applied to litigation involving conduct by a defendant which was directed to obtaining a financial advantage. Thus, in *Wilcox*, section 425.16 was applied to a dispute between groups of court reporters, in which the cross-complainant alleged that cross-defendants were supporting and encouraging litigation charging the cross-complainants with unfair business practices.[8]

On the face of the matter, Ludwig's activities qualified under the statute. The development of the Barstow mall, with potential environmental effects such as increased traffic and impaction on natural drainage, was clearly a matter of public interest. (See *Dixon* v. *Superior Court* (1994) 30 Cal.App.4th 733, 743-744 [36 Cal.Rptr.2d 687] [stressing the importance of public comments in CEQA proceedings "to inform those who ultimately make important decisions regarding the environment."].)

Assuming, then, that section 425.16 applies, Barstow had the burden of establishing a "probability" of success on the merits. (*Wilcox* v. *Superior Court, supra*, 27 Cal.App.4th at p. 820.) In *College Hospital, Inc.* v. *Superior Court* (1994) 8 Cal.4th 704 [34 Cal.Rptr.2d 898, 882 P.2d 894], the Supreme Court considered section 425.13, which, somewhat analogously to section 425.16, limits the seeking of punitive damages against health care providers by requiring the plaintiff to establish a "substantial probability" of prevailing on the claim for punitive damages before such a claim may be made. The court rejected the argument that the trial court, in ruling on such a request, should weigh the evidence in making its assessment of the claim. Such an approach, the court noted, would implicate the plaintiff's right to trial by jury. (8 Cal.4th at p. 719.) Instead, the court held that the motion for leave to seek damages should be denied if the evidence introduced "either negates or fails to reveal the actual existence of a triable claim. . . . This test is largely consistent with the 'prima facie' approach formulated by the Courts of Appeal." The court also pointed out that this showing must be made by "competent admissible evidence within the personal knowledge of the declarant," with reference to the familiar standard applied to evidentiary showings in summary judgment motions. (§ 437c, subds. (b) and (d).)

*College Hospital* is of particular significance because the court noted in passing a number of other statutes which set up procedural hurdles impeding the assertion of particular claims. (E.g., Civ. Code, § 1714.10, subd. (a)

---

[8]Additional authorities involving cases far removed from the prototype "big developer v. private citizen" will be discussed when we move to our consideration of constitutional principles.

requiring a plaintiff to show a "reasonable probability" of success in a conspiracy claim against an attorney; Code Civ. Proc., § 425.14, requiring a plaintiff to "substantiate" a claim for punitive damages against a religious organization.) The Supreme court found it "unlikely that each subtle difference in phraseology was intended to establish a completely different legal standard." (8 Cal.4th at p. 716.) As one of the statutes cited was section 425.16, we must construe it in accordance with the Supreme Court's analysis.

Barstow complains that the standard is too high in the context of section 425.16, which requires the defendant to make the motion to strike within 60 days of service of the complaint, and which therefore brings the question before the court at a time when the plaintiff will have had a limited opportunity to conduct discovery. (Cf. § 425.13, construed in *College Hospital*, which can allow up to two years for the plaintiff to seek leave to add a claim for punitive damages.) We recognize the concern, but we do not find it sufficiently compelling to justify a departure from the general standard of *College Hospital*. We note that the court in *Wilcox* v. *Superior Court, supra*, had concluded that section 425.16 imposed a "prima facie" standard before *College Hospital* was decided, holding that such a burden was appropriately moderate and was "compatible with the early stage at which the motion is brought and heard . . . and the limited opportunity to conduct discovery [citation]." (27 Cal.App.4th at p. 823.) *Wilcox* therefore answers Barstow's objection. We agree, and we also believe that an overly lenient standard would be wholly inappropriate, given that the statute is intended to "provid[e] a fast and inexpensive unmasking and dismissal of SLAPP's." (*Ibid.*) Obviously, the purpose of the statute would be frustrated if the plaintiff could drag on proceedings for many months by claiming a need to conduct additional investigation. The legislative intent is best served by an interpretation which would require a plaintiff to marshal facts sufficient to show the viability of the action *before* filing a SLAPP suit.

## II.

To this point, we have assumed, from the general nature of the case, that Ludwig is entitled to claim the protection of section 425.16. At first glance, the case appears entirely appropriate for the application of the statute. However, Barstow makes strongly urged arguments to the contrary. We find them without merit.

### A.

Barstow's first argument, or first class of arguments, is that Ludwig cannot claim any protection because Ludwig did not, personally, perform

any of the challenged acts. Barstow points out that it is not suing Keating, Krier, Hendrix, or Sweet, and therefore is not attacking their exercise of any protected right. This point is not germane.

The right to petition the government, or to seek legal redress, does not confer legal protection[9] solely on those persons formally addressing the governmental agency or formally filing a lawsuit. In *Pacific Gas & Electric Co.* v. *Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1135-1136 [270 Cal.Rptr. 1, 791 P.2d 587], the court relied upon the vital need to prevent chilling the exercise of these rights in holding that no cause of action for interference with contract or prospective advantage would lie against a defendant who *induced* the actual contracting party to file a lawsuit seeking to have the contract declared void. The court sensibly pointed out that "we have no public policy against the funding of litigation by outsiders. . . . If any person who induced another to bring a lawsuit involving a colorable claim could be liable in tort, free access to the courts could be choked off with an assiduous search for unnamed parties." (50 Cal.3d at p. 1136.) Significantly, it referred to a case of classic environmental litigation (*Sierra Club* v. *Butz* (N.D.Cal. 1972) 349 F.Supp. 934) to demonstrate the folly and impropriety of allowing suits against persons supporting litigation through funding.

This principle was recognized at least sub silentio in *Wilcox* v. *Superior Court, supra,* 27 Cal.App.4th 809 in which the cross-defendant was not an actual party to the original unfair-competition action, but had apparently confined her activities to soliciting funds and providing support for the litigation and its aims.[10]

The terms of the statute are consistent with this result. By its terms, it applies to a cause of action against a defendant "arising from *any act of that person in furtherance of the person's right of petition or free speech. . . .*" (Italics added.) It expressly includes any writing or speech "made in connection with an issue under consideration or review by a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law. . . ." There is no requirement that the writing or speech be promulgated directly *to* the official body.

---

[9]We discuss the parameters of this protection below.

[10]The Ninth Circuit has also implicitly reached the same conclusion in a case factually very similar to this one. In *Liberty Lake Investments* v. *Magnuson* (9th Cir. 1993) 12 F.3d 155, 158-159, the court bluntly rejected any effort to deprive the defendant of constitutional protections because he had instigated and funded antidevelopment, environmentally based litigation brought by others. Although the court's primary discussion is based upon the plaintiff's inability to prove that the underlying litigation had been baseless and the irrelevance of the defendant's motivation (see below), it clearly found the fact that the defendant did not personally file the underlying action to be immaterial to its analysis.

It is well established that a statute open to more than one construction should be construed so as to avoid anomalous or absurd results. (*In re Eric J.* (1979) 25 Cal.3d 522, 537 [159 Cal.Rptr. 317, 601 P.2d 549].) We assume the same principle applies to the Constitution. A person can exercise his own rights by supporting the forceful activities of others; it would be absurd to hold that the confident opponent who takes the public podium is protected, while the shy opponent who prefers to lend moral support by standing silently in the audience is not.

In this case, Barstow's whole case against Ludwig depends on the fact that he instigated the Keating and Krier lawsuits, and encouraged Hendrix and Sweet to speak against the Tanger project. We see no meaningful difference between a person who supports and encourages the filing of a lawsuit, and one who supports and encourages a third party to speak out publicly on a matter of public interest. *Pacific Gas & Electric* is dispositive on the issue. Its holding applies equally to the lawsuits and the public hearings, because "[t]he right of access to the courts is indeed but one aspect of the right of petition." (*California Motor Transport* v. *Trucking Unlimited* (1972) 404 U.S. 508, 510 [30 L.Ed.2d 642, 646, 92 S.Ct. 609].) As a threshold matter, Barstow is seeking to hold Ludwig liable for the exercise of a right protected by section 425.16.

## B.

Barstow also insists that Ludwig cannot seek shelter under section 425.16 because that statute only protects communicative conduct, and Barstow asserts that it is seeking to hold Ludwig liable for *noncommunicative* conduct. Barstow is wrong.

Barstow relies heavily on *Kimmel* v. *Goland* (1990) 51 Cal.3d 202 [271 Cal.Rptr. 191, 793 P.2d 524]—a case which we find remarkably inapposite. *Kimmel* involved a dispute between mobilehome park tenants and the park owners, a dispute which threatened to lead to litigation. In anticipation of the lawsuit, three of the tenants surreptitiously tape recorded conversations with park management personnel without the latter's consent. When management learned of the existence of the tapes, it filed a cross-complaint seeking damages for the illegal recording. (Pen. Code, §§ 632, 637.2.) The tenants, as cross-defendants, moved for judgment on the pleadings on the basis of the litigation privilege codified in Civil Code section 47, subdivision 2[11], and the trial court granted the motion.

The Supreme Court upheld a judgment of the Court of Appeal *reversing* the judgment, for the simple and obvious reason that the tenants' acts of

---

[11]Now Civil Code section 47, subdivision (b).

secretly taping the conversations were not a "publication or broadcast"—the activities expressly protected by the statute controlling case. (51 Cal.3d at p. 209.) Expanding upon its earlier decision in *Ribas* v. *Clark* (1985) 38 Cal.3d 355, 365 [212 Cal.Rptr. 143, 696 P.2d 637, 49 A.L.R.4th 417], it explained that no cause of action could be based on any communication or publication of material obtained through the illegal wiretap, if that communication or publication occurred in the course of a judicial proceeding; however, this rule, deriving from the privilege set out in Civil Code section 47, subdivision 2, did not prevent the park management from suing for damages resulting from the illegal recording itself.[12] The court expressed the view that extending the litigation privilege as requested by the tenants would have "unacceptable consequences"; the example it used was that the benefit of such an extension could be claimed by a prospective plaintiff who, in anticipation of litigation, burgled his opponent's premises in order to obtain evidence.

We think that *Kimmel* was an easy case and very far from the matter at hand. We find Barstow's arguments that Ludwig is being sued for "noncommunicative" conduct to be impenetrable as well as off the point.

To begin with, Civil Code section 47 expressly applies its privilege only to a "publication or broadcast" made in specified circumstances, which include, under subdivision (b), judicial, legislative, and other official proceedings. Code of Civil Procedure section 425.16 is not so limited; it extends to "*any* act . . . in furtherance of the . . . right [to] petition . . . ."[13] (Italics added.) The constitutional right to petition, as we have seen, includes the basic act of filing litigation or otherwise seeking administrative action. (*California Motor Transport Co.* v. *Trucking Unlimited, supra,* 404 U.S. 508.) It is respect for this right, and the free access to the courts which is encompassed therein, that has led our Supreme Court to refuse to permit a lawsuit for abuse of process to be based solely on the improperly motivated filing of a lawsuit. (*Oren Royal Oaks Venture* v. *Greenberg, Bernhard, Weiss & Karma, Inc.* (1986) 42 Cal.3d 1157, 1170 [232 Cal.Rptr. 567, 728 P.2d 1202], noted in *Pacific Gas & Electric Co.* v. *Bear Stearns & Co., supra,* 50 Cal.3d at p. 1133.)

However, we need not expand upon the type of conduct that is covered by the petition privilege and section 425.16, because we are wholly unable to

---

[12]As then effective, Penal Code section 637.2 provided for a minimum award of damages of $3,000, with a potential for a greater award if the plaintiff could show actual damages. Of course, as *Kimmel* makes clear, the "actual damages" could not include damages resulting from the publication of the recorded material in the lawsuit.

[13]In *Pacific Gas & Electric* v. *Bear Stearns & Co., supra,* 50 Cal.3d at page 1132, footnote 12, the court noted that the privilege of Civil Code section 47 would not protect all of the conduct alleged in that case. Although it might protect an "exhortation to sue," it would not, on its face, protect financing litigation. The contrasting language in Code of Civil Procedure section 425.16 is thus illuminating.

perceive any conduct by Ludwig which should not, in a fair analysis, be characterized as "communicative."

Barstow contends strenuously that Ludwig's activities in recruiting and encouraging his agents are "noncommunicative." We are at a loss to imagine how Ludwig accomplished the recruiting and encouragement without communication. (See *Rubin* v. *Green* (1993) 4 Cal.4th 1187, 1195-1196 [17 Cal.Rptr.2d 828, 847 P.2d 1044] [holding that misrepresentations in the course of alleged attorney solicitation were "communicative in their essential nature," limiting *Kimmel*].) We must assume that he asked Keating, Krier, Hendrix and Sweet to take certain actions on his behalf. This required a communication. Further communicative conduct was then committed by the agents in speaking, writing, and making allegations in legal documents.

Barstow's attempt to rely upon Ludwig's failure to reveal his role in the lawsuits and his refusal to comply with discovery requests is of no assistance. Even if Ludwig's secrecy was "wrongful" under some principle of law—which we do not find—it is clear from Barstow's evidence that Barstow was at the very least highly suspicious that Ludwig was behind the opposition to the Tanger project virtually from the beginning. Ludwig's efforts to conceal his role were entirely unsuccessful and can have had no real effect.[14] His failure to perform discovery obligations was subject to a speedy remedy in the court actions themselves, and, as a matter of policy, no separate tort claim can be stated for any such failure. (See *Lossing* v. *Superior Court* (1989) 207 Cal.App.3d 635, 639 [255 Cal.Rptr. 18] [defendant's conduct in seeking a discovery sanction in one lawsuit could not be the basis for a separate malicious prosecution action, with strong policy statement]; *Silver* v. *Gold* (1989) 211 Cal.App.3d 17, 23-24 [259 Cal.Rptr. 185] [unsuccessful motion to disqualify counsel in the main action cannot be the basis for a separate malicious prosecution suit].)

Thus, we find that all of Ludwig's alleged actions were entitled to be evaluated under section 425.16. However, that section does not *bar* lawsuits against persons who are involved in matters of public interest; it merely requires that the plaintiff show that there is a "probability" that the claim asserted will be successful. We now turn to Barstow's effort to show that it would prevail against Ludwig.

---

[14]For example, Clyde Sweet admitted to Barstow's city attorney that he was working for Ludwig after Sweet spoke at the public meeting on January 10, 1994—the first opposition voiced by any of Ludwig's agents. In February 1994, after Attorney Cynthia Ludvigsen made a request for information on the project, her purported client, Robert Hammock, admitted to Barstow's city manager that he was being prompted by Ludwig. The attorney for Sheree Krier virtually admitted that Ludwig was behind her lawsuit *before* it was filed.

## III.

We first deal with the actions of Sweet and Hendrix. To recap, Sweet appeared at a Barstow City Council meeting on January 10, 1994, and "opposed" the Tanger project. As best one can tell, this opposition was based on environmental factors. Hendrix appeared on May 16, 1994, "requesting additional public hearings." He apparently also raised traffic and drainage concerns.[15] Hendrix also wrote to Barstow requesting a copy of final plans and the drainage study. It is alleged by Barstow that these acts were done with bad motives, inspired in turn by Ludwig's bad motives.[16]

Section 425.16 sets out a mere rule of procedure, but it is founded in constitutional doctrine. "Those who petition the government are generally immune from . . . liability."[17] (*Real Estate Investors* v. *Columbia Pictures* (1993) 508 U.S. 49 [123 L.Ed.2d 611, 621, 113 S.Ct. 1920, 1926].) The principle is often referred to as the *"Noerr-Pennington"*[18] doctrine and, as the recent decision in *Real Estate Investors* demonstrates, retains full vitality. The principle unquestionably applies to commercial speech and competitive

[15]The declaration of Christopher Garrett consistently indicates that Hendrix merely spoke in a neutral manner, and in fact that he stated he was *not* opposed to the project but merely wanted more information.

[16]In this context we deal briefly with Barstow's attempt to show that the environmental objections raised were meritless. The community development director, Paul Warner, declared that "the claims" by Sweet and Hendrix (whatever these claims were) "were wholly without merit" for reasons not given. With all due deference to Mr. Warner, we think his flat assertion of a legal conclusion carries little weight.

Similarly, Attorney Christopher Garrett informed the court that his review of the Keating lawsuit demonstrated that it was "without merit" for three reasons: 1) Keating lacked standing, because "based on a review of public records" (which ones? by who?) "the City determined that he resided in the City of San Bernardino and did not own property in the City of Barstow," 2) Keating had failed to appear before the city council and thus had not exhausted his administrative remedies, and 3) "the City had provided for compliance with CEQA . . . ." Again, with respect to (3), we cannot accept Mr. Garrett's bald resolution of the legal issue underlying the Keating lawsuit. His explanation of the lack of merit of the Krier lawsuit is similar. Neither declaration meets the requirement of *College Hospital, Inc.* v. *Superior Court, supra,* 8 Cal.4th 704 that the plaintiff provide *competent* and *admissible* evidence in support of its claim.

[17]The omitted word in the text is "antitrust." However, the principle applies to virtually any tort, including unfair competition and interference with contract. (See *Hi-Top Steel Corp.* v. *Lehrer* (1994) 24 Cal.App.4th 570, 577-578 [29 Cal.Rptr.2d 646] and cases cited.) Obviously, " 'the principle of constitutional law that bars litigation arising from injuries received as a consequence of First Amendment petitioning activity [should be applied], regardless of the underlying cause of action asserted by the plaintiffs.' [Citation.] '[T]o hold otherwise would effectively chill the defendants' First Amendment rights.' [Citation.]" (*Ibid.*) We discuss one arguably relevant exception later.

[18]*Eastern R. Presidents Conference* v. *Noerr Motor Freight, Inc.* (1961) 365 U.S. 127 [5 L.Ed.2d 464, 81 S.Ct. 523]; *Mine Workers* v. *Pennington* (1965) 381 U.S. 657 [14 L.Ed.2d 626, 85 S.Ct. 1585].

activity—even *anticompetitive* activity. (*Mine Workers* v. *Pennington, supra,* 381 U.S. at p. 670 [14 L.Ed.2d at p. 636].)

Under this doctrine, it has long been clear that the motive of the petitioners is irrelevant, *as long as* the intent is genuinely to induce government action rather than to frustrate or deter a third party simply by the *use* of the governmental process. (See *Columbia* v. *Omni Outdoor Advertising, Inc.* (1991) 499 U.S. 365, 379-380 [113 L.Ed.2d 382, 397-398, 111 S.Ct. 1344, 1354], discussed in *Real Estate Investors* v. *Columbia Pictures, supra,* 508 U.S. at p. __ [123 L.Ed.2d at pp. 623-624, 113 S.Ct. at p. 1928]; *Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 322 [216 Cal.Rptr. 718, 703 P.2d 58].) In this case, we will assume that it remains in question whether Sweet and Hendrix (and Ludwig behind them) genuinely hoped to persuade Barstow to delay the Tanger project for the purpose of addressing environmental concerns, or whether they hoped to discourage Tanger itself by a show of public opposition and the prospect of controversy. Barstow failed to show a "probability" of proving the viability of this portion of its claims because it failed to show that the concerns expressed by Sweet and Hendrix were without merit.[19] (See fn. 15, *ante.*)

The *Noerr-Pennington* doctrine, as refined and explained in *Real Estate Investors,* has two prongs. First (or rather second, under the usual analysis), the challenged action must have been undertaken with an improper motive. That is, it must have been done not with the hope of securing a favorable governmental result, but solely to harass and hinder another party. The other prong of the doctrine is that the challenged action must have been objectively baseless. Absent such a patent lack of merit, an action protected under the First Amendment by the right of petition cannot be the basis for litigation. (*Real Estate Investors* v. *Columbia Pictures supra,* 508 U.S. at p. __ [123 L.Ed.2d at pp. 623-624, 113 S.Ct. at p. 1929].)[20]

In this case, it is apparent from the record that the actions of Sweet and Hendrix were, to put it mildly, de minimis. Sweet spoke at one meeting, and

---

[19]Barstow argues that the conduct of Sweet and Hendrix was "objectively baseless" because they did not have "standing" in that neither resided in or owned property in Barstow. We are not sure where the proof of these facts is to be found. Nor does Barstow persuade us that a citizen requires "standing" simply to speak at a meeting or request information. No doubt a public entity may brush off objections or inquiries from nonresidents, but this does not mean that such persons act "wrongfully" when they voice concerns in a public forum.

Barstow also argues that even if Sweet, for example, had "standing," he didn't *really* have standing because he was acting for Ludwig, who didn't have standing. This kind of argument takes us through the looking glass with Alice. Jam yesterday, and jam tomorrow, but never jam today.

[20]At oral argument, Barstow argued that the case was controlled by *Hi-Top Steel Corp.* v. *Lehrer, supra,* 24 Cal.App.4th 570, at footnote 17, *ante.* We may assume that the opinion in that case accurately summarizes the "sham" exception as it was recognized before it was further refined in *Real Estate Investors.* (The opinion in *Hi-Top Steel,* although issued almost

apparently made objections going to the effect of the Tanger project on traffic and drainage.[21] Hendrix apparently expressed the view that more information was necessary, or at least desirable, before the project was approved. Barstow utterly failed to show that these expressed concerns had no reasonable basis or that no reasonable person could have expected the action taken to lead to governmental results.[22] The trial court was provided with nothing to demonstrate, even at the prima facie level required by *College Hospital*, that proper consideration *in fact* had been given to potential traffic and drainage problems at the time Sweet and Hendrix spoke. Barstow failed to show that the comments of Sweet and Hendrix were objectively baseless.[23]

---

a year after the decision in *Real Estate Investors*, does not cite that case or discuss its requirement that the targeted actions have been "objectively baseless.") However, *Hi-Top's* recognition of a sham exception to First Amendment rights does not aid Barstow. That case involed the adequacy of *pleading*, not the ability of the plaintiff to support the action with facts. We will also assume that Barstow's pleading is adequate; it failed, however, to establish the likelihood of prevailing as a matter of fact.

[21]We are not informed whether Barstow actually took action in response to Sweet's objections. If it did not, then Sweet's actions can hardly be said to have had any damaging effect (although we discuss the "pattern" issue below).

[22]We note again that although some of the language in the cases on which we rely is not entirely apposite to the situation of a public comment at a legislative meeting, *Noerr-Pennington* applies to all facets of the exercise of the right of petition, from litigation to attempts to influence opinion. (*California Motor Transport* v. *Trucking Unlimited, supra*, 404 U.S. at p. 510 [30 L.Ed.2d at p. 646].)

[23]Barstow may complain that we put too onerous a burden on it. We do not decide what showing would be sufficient, but we note that Barstow made no effort to explain to the trial court what preliminary steps and studies had been done. In fact, the record leaves Barstow's manner of proceeding obscure. It appears that Barstow's agreement with Tanger Properties contemplated completion of environmental steps after the project was approved.

On the other hand, it cannot be said to have been unreasonable for any citizen to have raised questions about the propriety of entering into an agreement for the construction of a project before any environmental information had been collected. Although the agreement purported to be contingent on satisfactory environmental studies, a reasonable person could suspect that Barstow would be under pressure to find the studies "satisfactory" so as to avoid the inevitably messy cancellation of a lucrative project in progress. A reasonable person could also suspect that Barstow's election to enter into such an agreement signalled its intention to allow the project to proceed no matter what the studies showed after the project was approved. For these reasons as well, Barstow's failure to explicitly describe its preliminary environmental steps hampered its attempt to show that the objections were baseless.

We do not say that Barstow's method of proceeding was either illegal or improper. (See *Stand Tall on Principles* v. *Shasta Union High Sch. Dist.*(1991) 235 Cal.App.3d 772, 778-782 [1 Cal.Rptr.2d 107].) When time is of the essence, it is not necessarily unreasonable for a public entity to offer at least preliminary assurance to the developer that his project is viewed favorably by the entity.

We also stress again that the purpose of section 425.16 is well served by requiring the plaintiff to make a positive showing. The statute clearly expresses a legislative suspicion of SLAPP suits and an intent to weed out all but those having demonstrable merit. It is not unfair to insist that a party who chooses to bring what appears on its face to be a SLAPP suit be

■ We now address the Keating and Krier lawsuits. We find them subject to an insuperable barrier.[24]

In recent years our Supreme Court has several times had occasion to consider the scope of the "litigation privilege" established by Civil Code section 47, subdivision (b). The court has consistently and forcefully reiterated that the privilege is virtually absolute and that the *only* tort cause of action which can be based upon the initiation of a lawsuit (or communicative acts related to the lawsuit) is that of malicious prosecution. (*Silberg* v. *Anderson* (1990) 50 Cal.3d 205, 215-216 [266 Cal.Rptr. 638, 786 P.2d 365]; *Rubin* v. *Green, supra,* 4 Cal.4th at p. 1194; see also *Heller* v. *Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30, 45 [32 Cal.Rptr.2d 200, 876 P.2d 999].)[25] The basis for the rule, which gives preference to the policy of encouraging free access to the courts over the interest in being free from damaging activities which otherwise might be categorized as defamation or the infliction of emotional distress, has been thoroughly discussed in the cases and, as an intermediate court bound by the pronouncements of the Supreme Court, we need not repeat it. (See also *Pacific Gas & Electric* v. *Bear, Stearns & Co., supra,* 50 Cal.3d 1118.)

Thus, were Barstow to have sued Keating and Krier, without question its sole remedy would have been an action for malicious prosecution.

However, as Barstow repeatedly stresses, it is not suing Keating or Krier; it is suing Ludwig. We will agree, arguendo, that a former defendant *can* assert other tort causes of action against a party who *urged* the prior

prepared to back up his claim with facts. Under *College Hospital*, it is not sufficient for the plaintiff simply to assure the court that the defendant's actions were legally and/or factually baseless.

[24]As we begin our discussion of a possible cause of action for malicious prosecution, we are aware that Barstow has not attempted to state any such claim and has not formally been given the opportunity to do so in the trial court. However, in our request for an informal response, we expressly asked Barstow to address the issue of whether any tort remedy other than malicious prosecution was available, as well as the "favorable termination" problem we discuss below. Thus, Barstow has had every opportunity to argue the issue, and the factual record is complete in all pertinent respects. Thus, we have deemed it more efficient to consider whether, if Barstow were to plead such a claim against Ludwig, it could support it to the extent required by section 425.16.

[25]In *Heller,* the court found it unnecessary to decide whether a cause of action based on an invasion of the constitutional right of privacy committed during litigation would be another permitted action in addition to malicious prosecution. (8 Cal.4th at p. 42.) In *Urbaniak* v. *Newton* (1991) 226 Cal.App.3d 1128, 1138 [277 Cal.Rptr. 354], the court held that Civil Code section 47, subdivision (b) could not immunize conduct made actionable by the California Constitution. That court also recognized, however, that Civil Code section 47, subdivision (b) frequently also protects a constitutional right, thus requiring a difficult balancing of interests. The issue is not before us.

litigation, but did not *file* it.[26] The holding in *Pacific Gas & Electric Co.* v. *Bear Stearns & Co.*, *supra*, 50 Cal.3d 1118 does not prohibit the filing of such torts; we note that such other claims were made against the cross-defendant in *Wilcox* v. *Superior Court*, *supra*, 27 Cal.App.4th 809. However, this does not aid Barstow.

In *Pacific Gas & Electric* v. *Bear Stearns & Co.*, the court was confronted with claims similar to those here, including one for intentional interference with contract. Although the court did not hold that the plaintiff's only remedy against the defendant was a cause of action for malicious prosecution,[27] it *did* hold that the plaintiff's claims against the defendant must be measured by the standards applicable to a malicious prosecution action. That is, the plaintiff "must allege that the litigation was brought without probable cause and that the litigation concluded in plaintiff's favor." (50 Cal.3d at p. 1137.) Thus, for Barstow to prevail it was essential that it provide a prima facie case on these points no matter how it chose to label its claims.

We find that Barstow failed to do so and cannot do so. We have commented above on the inadequacy of Barstow's efforts to show that the challenges to its procedures in approving the Tanger project were "objectively baseless." Barstow was required to provide "competent, admissible evidence" (*College Hospital, Inc.*; *Wilcox*), not merely the cryptic, conclusionary opinion of its attorney.

Barstow, however, has urged repeatedly that the lawsuits were "objectively baseless" because neither Keating nor Krier had legal standing to sue.[28] The issue of standing to bring a CEQA challenge is a complex one, both in respect to the concept of exhaustion of administrative remedies and that of possession of a legal beneficial interest. (See and cf., e.g., *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 272 [118 Cal.Rptr. 249, 529 P.2d 1017]; *California Aviation Council* v. *County of Amador* (1988) 200

---

[26]However, a person who urges, procures, or otherwise is actively instrumental in the filing of a lawsuit may be sued for malicious prosecution along with the actual plaintiff/prosecutor. (*Pacific Gas & Electric* v. *Bear Stearns & Co.*, *supra*, 50 Cal.3d at p. 1131, fn. 11; *Cedars-Sinai Medical Center* v. *Superior Court* (1988) 206 Cal.App.3d 414, 417 [253 Cal.Rptr. 561]; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 418, p. 503.) Thus, under the facts developed in the record, Ludwig is subject to suit as a defendant in a malicious prosecution action.

[27]No such cause of action could have been pleaded in that case, because the underlying litigation was still pending when the complaint was filed.

[28]At least one federal case takes the position that the prosecution of a lawsuit—however meritorious—by one who does not possess legal standing to sue can constitute "objectively baseless" conduct. (*In re Burlington Northern, Inc.* (5th Cir. 1987) 822 F.2d 518, 530.) We might question the wisdom of applying such an approach to an action raising environmental concerns, given both the importance of encouraging public participation in land use decisions, and the uncertainty concerning standing, which we mention below.

Cal.App.3d 337, 340-345 [246 Cal.Rptr. 110]; *Kane* v. *Redevelopment Agency* (1986) 179 Cal.App.3d 899, 903-908 [224 Cal.Rptr. 922]; *Environmental Law Fund, Inc.* v. *Town of Corte Madera* (1975) 49 Cal.App.3d 105, 114 [122 Cal.Rptr. 282].) On the record before us, it would not be easy to resolve.[29] Fortunately, we need not do so, because Barstow has effectively resolved it for us.

One of the essential elements of an action for malicious prosecution (see *Pacific Gas & Electric Co.* v. *Bear Stearns & Co.*) is that the prior litigation have resulted in a " 'favorable termination' " as far as the plaintiff is concerned. The basis for the requirement is that it " 'tends to indicate the innocence of the accused . . . .' " (*Lackner* v. *LaCroix* (1979) 25 Cal.3d 747, 750 [159 Cal.Rptr. 693, 602 P.2d 393].) "The requirement of favorable termination has been variously defined but the core of the concept is that termination must reflect on the *merits* of the prior action."[30] (*Warren* v. *Wasserman, Comden & Casselman* (1990) 220 Cal.App.3d 1297, 1301 [271 Cal.Rptr. 579], citing *Lackner* v. *LaCroix, supra,* italics in original.)

In the Keating and Krier cases, plaintiffs voluntarily dismissed the actions. A voluntary and *unilateral* dismissal can constitute a decision on the merits. Thus, in *MacDonald* v. *Joslyn* (1969) 275 Cal.App.2d 282, 289 [79 Cal.Rptr. 707, 35 A.L.R.3d 641] the defendant, as plaintiff in the prior action (a will contest) had gone through three sets of lawyers in less than five months; the third firm sought and received leave to withdraw on the ground that defendant had failed to provide them with any information or evidence supporting the contest; defendant then appeared in propria persona and dismissed the action. In the circumstances, the dismissal reflected on the merits. Somewhat analogously, a dismissal for failure to diligently prosecute creates an "assumption that one does not simply abandon a meritorious action once instituted," and thus constitutes a termination in favor of the defendant. (*Minasian* v. *Sapse, supra,* 80 Cal.App.3d at p. 827.)

---

[29]Again we refer to the defects in Barstow's efforts to show that neither Keating nor Krier had standing in the sense of a protectible beneficial interest in a project to be built in Barstow. (See *Bozung.*) The question of whether either attempted to exhaust administrative remedies appears to have been more susceptible to resolution in Barstow's favor.

[30]The holding of *Lackner*, followed in *Warren* v. *Wasserman, Comden & Casselman*, is that a termination based on a "technical or procedural as distinguished from substantive" issue is not "on the merits" for the purpose of bringing a subsequent malicious prosecution action. Thus, in those cases, a termination based on the statute of limitations did not qualify as a "favorable termination."

Under this rule, we question whether even a dismissal based on any lack of standing or exhaustion of administrative remedies should be held to reflect on the *merits*. Barstow's assertion that the Keating and Krier lawsuits were vulnerable on these grounds does not appear to assist it. (See also *Minasian* v. *Sapse* (1978) 80 Cal.App.3d 823, 827 [145 Cal.Rptr. 829] [citing authority to the effect that a dismissal based on lack of jurisdiction does not reflect on the merits].)

However, a dismissal resulting from a *settlement* is almost invariably held not to reflect on the merits and not to support any cause of action for malicious prosecution. "Generally, a dismissal resulting from a settlement does not constitute a favorable determination because '. . . the dismissal reflects ambiguously on the merits of the action as it results from the joint action of the parties, thus leaving open the question of defendant's guilt or innocence.'" (*Pender* v. *Radin* (1994) 23 Cal.App.4th 1807, 1814 [29 Cal.Rptr.2d 36], quoting *Minasian* v. *Sapse, supra,* 80 Cal.App.3d at p. 827, fn. 4.)

Here, both the Keating and Krier lawsuits were dismissed by the plaintiffs after the execution of settlement agreements. In the Keating case, the parties agreed to a cost waiver *and* Barstow agreed to recirculate the proposed negative declaration for the Tanger project. Barstow's concessions in the Krier matter involved the payment of at least $75,000, mostly to Krier and/or her attorney, and the remainder for the environmental purposes presumably favored by Krier.[31] A simple waiver of costs is alone enough to disqualify a settlement as a "favorable termination." (*Pender* v. *Radin, supra,* 23 Cal.App.4th at p. 1814.) Thus, it is clear that the settlements here involved a compromise and the surrender of something of value by Barstow.[32]

Barstow, however, argues that the reasons underlying a dismissal are a question of fact, and that as it agreed to the settlements only under duress, it may now argue that the settlements reflect in its favor as a matter of fact. Barstow is wrong.

There is some authority to support the proposition that if a termination is not clearly on the merits (as by a judgment after trial), "the reasons underlying the termination must be examined to see if it reflects the opinion of either the court or the prosecuting party that the action would not succeed." (*Haight* v. *Handweiler* (1988) 199 Cal.App.3d 85, 88 [244 Cal.Rptr. 488].) In *Haight,* for example, the prior action had resulted in a settlement by one defendant in return for plaintiff's dismissal of that defendant *and* the defendant who later sued for malicious prosecution. The latter case went to trial and evidence was taken on the question of the original plaintiff's motives in dismissing the defendant, with the court ruling that the dismissal was made solely because the paying defendant required it. This was held not to reflect on the merits, and the malicious prosecution suit failed.

---

[31]We comment again, with some puzzlement, that the agreement contemplated that Krier would receive $20,000 for work opposing *Ludwig's* proposed Adelanto project.

[32]That the Krier settlement was the result of actual negotiation is indicated by the fact that unsigned drafts of an agreement in the record provide for smaller payments and fundings by Barstow.

However, *Haight* must be read in light of its facts—specifically, that it involved a dismissal in favor of a defendant who did *not* pay anything, did *not* give up anything, and did *not* even consent to the settlement. Despite these apparent *indicia* in favor of defendant, the court allowed the *plaintiff* to show that the dismissal was motivated by considerations not going to the merits. By contrast, where a defendant has participated in a settlement, efforts to argue that the settlement really does reflect the plaintiff's opinion on the merits have met with no success.

In *Pender* v. *Radin*, *supra*, three family members were sued on a contract. One defendant settled for the payment of cash, and all three waived costs and attorney fees; furthermore, the two who did not personally pay money to plaintiff assisted the relative who *did* pay by forgiving a debt he owed them. In affirming the granting of summary judgment for the malicious prosecution defendant, the court stated flatly that "the Penders cannot establish that Radin's lawsuit was terminated in their favor . . . by the terms of the settlement, the Penders waived fees and costs and thereby gave up something to get the lawsuit against them dismissed. *On these facts, the Penders cannot show there had been a legal termination of the Radin lawsuit in their favor; rather, the Radin litigation was terminated by agreement without regard to its merits.*" (23 Cal.App.4th at p. 1814, italics added.)

*Villa* v. *Cole* (1992) 4 Cal.App.4th 1327 [6 Cal.Rptr.2d 644], cited by Barstow, is similar to *Haight* v. *Handweiler.* The malicious prosecution action was brought by a defendant who was dismissed as part of a "global settlement" in which he did not participate and to which he did not agree. However, once it was established that the defendant who negotiated the settlement had demanded the dismissal of the other defendant as a condition of settling, the matter was closed; no cause of action for malicious prosecution could be brought by the nonagreeing defendant.

Significant to this case is the court's treatment of the argument that the malicious prosecution plaintiff should be permitted to inquire into the motivations of the original plaintiff, in an effort to establish that they *really* dismissed him because they felt the action could not be won against him. The court pointed out that this argument "wrongly confuses the elements of probable cause and favorable termination. 'Whether a prior action was legally tenable goes to the issue of probable cause, that is, did the defendant have an honest and reasonable belief in the truth of the allegations. [Citation.] Whether a prior action was terminated favorably tends to show the innocence of the defendant in the prior action [citations] and is not affected by the objective tenability of the claim. In short, these two elements of the malicious prosecution tort serve different purposes, and the legal tenability

of the underlying action is not the standard by which to judge whether the action was terminated in [the malicious prosecution plaintiff]'s favor. The standard . . . is simply whether the termination bears on the merits of the underlying action.' " (4 Cal.App.4th at p. 1337, citing *Warren* v. *Wasserman, Comden & Casselman, supra,* 220 Cal.App.3d at p. 1303.) The *Villa* court then held that, because the nature of the settlement as a matter of law did not constitute a favorable termination, the original plaintiffs' motivations for settling the prior action, and the viability of that action, were irrelevant.

These principles control this case, especially when it is remembered that, according to the statutory scheme, Barstow had to show a "probability" that it would prevail. Once again we note that, with the possible exception of the standing/exhaustion issues, Barstow did not come close to establishing that the two lawsuits lacked merit. We are unimpressed with its argument that the settlements were prompted solely by the nuisance value of the lawsuits and, in the Krier case, by the danger of losing the Tanger project. *Villa* and *Handweiler* make clear that if a dismissal results from a negotiated settlement, the plaintiff's motivation is not to be considered; we hold that a defendant who elects to settle a lawsuit may not later come into court as a plaintiff and insist that because he only did so under duress, he should be allowed to prove that the action was baseless. As the cases demonstrate, this argument misses the point. A negotiated settlement does not constitute a "favorable termination."

Of course we recognize that cases are settled for many reasons and we are sympathetic to the problem of nuisance suits. However, actions for malicious prosecution have historically been viewed with disfavor due to the potential chilling effect on persons considering reporting a crime or pursuing legal remedies in court. (*Pender* v. *Radin, supra,* 23 Cal.App.4th at p. 1818.) For this reason, the twin requirements of no probable cause and favorable termination are, and should be, strictly enforced. There is no legal way for a defendant who elects to settle a suit rather than going to trial to demonstrate that the dismissal resulting from the settlement constituted a favorable termination on the merits.

Having, pursuant to the direction in *Pacific Gas & Electric Co.* v. *Bear Stearns & Co.,* applied the standards for malicious prosecution actions to Barstow's claims here, we determine that they cannot succeed.[33] The trial court erred in denying Ludwig's motion to strike under section 425.16.

---

[33]Barstow proffers the argument that Ludwig engaged in a "series" of baseless challenges. Federal cases recognize that one or more successful actions or administrative challenges may nevertheless form part of an overall pattern of strategic, bad faith action designed to frustrate a competitor. (See *USS-POSCO Indust.* v. *Contra Costa Cty. Bldg. & Const.* (9th Cir. 1994) 31

Let a peremptory writ issue as prayed. Costs and attorney fees to petitioner pursuant to subdivision (c) of § 425.16.

Dabney, Acting P. J., and McKinster, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied November 22, 1995. Mosk, J., was of the opinion that the petition should be granted.

---

F.3d 800, 810-811.) However, we find the rule inapplicable here. Barstow alleged only four acts, two of which, as we have found, cannot be said to have been meritless. We need not decide whether brief comments at a public meeting, or the requesting of information, can constitute part of a pattern of what is overall baseless opposition, because a total of four activities, two of which are not meritless as a matter of law, cannot constitute such a pattern. Compare *USS-POSCO Indust.*, which involved a total of 29 proceedings, 15 of which ended successfully; held, no pattern of baseless litigation was shown.

Barstow also insists that Ludwig, by concealing his role, perpetrated a fraud on the court. We have earlier commented on the ineffectiveness of any efforts by Ludwig in this respect. We also distinguish the situation in which a party commits "fraud" which has no effect on the outcome of litigation from that in which a party presents false evidence in an effort to corrupt the result. We agree that the latter conduct is not protected. (*Whelan* v. *Abell* (D.C. Cir. 1995) 48 F.3d 1247, 1255 [310 App.D.C. 396]; see also *Liberty Lake Investments, Inc.* v. *Magnuson*, *supra*, 12 F.2d at p. 159.) Here, any "fraud" by Ludwig had no effect on the litigation or Barstow's approach to the objections to the Tanger project. It was not actionable.