Filed 12/18/14

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| LENNAR HOMES OF CALIFORNIA, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> STELLA STEPHENS et al., <br><br> Defendants and Respondents. | E057280 <br><br> (Super.Ct.No. RIC1206473) <br><br> OPINION |

APPEAL from the Superior Court of Riverside County.  Daniel A. Ottolia, Judge.  Affirmed.

Jones Day, Richard S. Ruben, Darren K. Cottriel, and Nathaniel P. Garrett, for Plaintiff and Appellant.

McCuneWright, Richard D. McCune, David C. Wright, and Jae (Eddie) K. Kim, for Defendants and Respondents.

Defendants and respondents Stella Stephens, Timothy Young, and Melissa Young purchased homes from plaintiff and appellant Lennar Homes of California, Inc. (Lennar).

1

The agreements between Lennar and Stephens and between Lennar and the Youngs contain identical indemnity clauses.  In this lawsuit, Lennar attempts to enforce those indemnity clauses, seeking to recover attorney fees and costs incurred in defending a class action lawsuit, brought initially by Stephens, and later joined by Timothy Young— but not Melissa Young—in the United States District Court for the Central District of California.

Lennar appeals the trial court's order granting defendants' special motion to strike the complaint as a strategic lawsuit against public participation (anti-SLAPP motion) pursuant to Code of Civil Procedure section 425.16 (the anti-SLAPP statute).[1]  Lennar challenges the trial court's ruling that the indemnity clause at issue is unenforceable under California law, precluding Lennar from demonstrating a probability of success on the merits.  Lennar also disagrees with the trial court's finding that Lennar's claim against Melissa Young arises from activity protected under the anti-SLAPP statute.  We affirm.[2]

---

[1]  Further undesignated statutory references are to the Code of Civil Procedure.

[2]  The parties have stipulated to a dismissal of this case.  We elect to proceed with the opinion, as the appeal was fully briefed and the tentative opinion of this court was issued prior to the parties' informing us of the settlement, and the appeal raises issues warranting an opinion.  (*Greb v. Diamond Internat. Corp*. (2013) 56 Cal.4th 243, 247, fn. 3; California Rules of Court, rule 8.244(c)(2).)

## I. FACTS AND PROCEDURAL BACKGROUND

Lennar describes itself in its complaint as a corporation "engaged in the business of building quality new homes in residential communities in various parts of California." Stephens purchased a home from Lennar on June 25, 2005. The Youngs, who are a married couple, purchased a home from Lennar on July 22, 2006. The "Homebuyer Disclosure Statement" for both transactions contains the following indemnity clause:

"Wherever in this Disclosure Buyer has been informed regarding disclosure items, Buyer represents that Buyer will not make any claims against Builder for nondisclosure of disclosure items or for alleged improper disclosure of such items. Buyer shall indemnify, protect, defend and hold harmless Builder from any costs, expenses (including, without limitation, attorneys' fees and costs), liabilities, actions, demands and damages arising out of claims made by Buyer for nondisclosure or incomplete disclosure of the general disclosure items and items separately disclosed to Buyer in writing, or damages or harm to Buyer arising from such items."

Stephens was the named plaintiff in a class action lawsuit filed against Lennar on September 3, 2009, in the United States District Court, Central District of California, which was later consolidated with seven related cases. Timothy Young—but not Melissa Young—was named along with Stephens as a plaintiff in the first amended complaint, filed December 21, 2009. Their second amended complaint, filed December 2, 2011,

alleges fraudulent nondisclosure and misrepresentation under a variety of legal theories.[3] On March 26, 2012, the district court dismissed the second amended complaint without leave to amend. As of the time of briefing in the present appeal, the appeal of the district court's dismissal of the second amended complaint remained pending in the Ninth Circuit Court of Appeals.

Lennar's complaint in the present case was filed on May 1, 2012. Lennar asserts a single cause of action against each of the defendants for express contractual indemnity, seeking to recover attorney's fees and costs expended defending the allegations brought in federal court by Stephens and the Youngs, as well as the attorney's fees and costs of the present action, pursuant to the indemnity clause.

Defendants filed their anti-SLAPP motion on June 8, 2012. They concurrently filed a demurrer to the complaint.[4] The anti-SLAPP motion was heard by the trial court on July 6, 2012. After taking the matter under submission, the trial court issued a written order on August 6, 2012. The trial court ruled defendants had met their burden under the first prong of the anti-SLAPP analysis to show Lennar's cause of action was based on protected activity, and that Lennar could not meet its burden under the second prong to show a probability of success on the merits because the indemnity clause is

---

[3] Only the second amended complaint appears in our record.
[4] Defendants' demurrer and supporting documents, as well as Lennar's response thereto, do not appear in our record, except as entries on the docket of the trial court.

4

unenforceable. On that basis, the trial court granted defendant's anti-SLAPP motion, rendering the demurrer moot.

On August 21, 2012, Lennar filed a "Motion to Request Ruling on or Clarification of Portions of Order Granting Defendants' Special Anti-SLAPP Motion to Strike Complaint" (capitalization omitted), focusing specifically on the trial court's ruling with respect to Melissa Young. Defendants opposed Lennar's motion, submitting among other things a declaration from Melissa Young regarding her role in the federal litigation, averring she had actively assisted and supported her husband, and the decision to pursue the federal litigation related to their joint purchase of a house "was a married couple's decision." In an order issued October 2, 2012, the trial court specified it found Melissa Young's actions to be protected activity under the anti-SLAPP statute, and reaffirmed its previous decision to grant defendant's anti-SLAPP motion with respect to all defendants.[5]

---

[5] The trial court characterized its ruling as a denial of Lennar's motion to reconsider. That characterization is not quite correct: the trial court did reconsider its earlier ruling, reaching the merits of Lennar's arguments, but was not persuaded to change its mind. (See *Corns v. Miller* (1986) 181 Cal.App.3d 195, 202 [Fourth Dist., Div. Two] [if requirements of § 1008 are met, "but the court is not persuaded the earlier ruling was erroneous, the proper course is to grant reconsideration and to reaffirm the earlier ruling"].)

## II.  DISCUSSION

### A.  Overview of Anti-SLAPP Motions

Courts construe the anti-SLAPP statute broadly to protect the constitutional rights of petition and free speech.  (§ 425.16, subd. (a); *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 199 (*Kibler*).)  In ruling on an anti-SLAPP motion, the trial court conducts a two-part analysis: the moving party bears the initial burden of establishing a prima facie case that the plaintiff's cause of action arose from the defendant's actions in the furtherance of the rights of petition or free speech.  (§ 425.16, subd. (b)(1); *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.) "'[I]t is the *principal thrust* or *gravamen* of the plaintiff's cause of action that determines whether the anti-SLAPP statute applies . . . .'"  (*Raining Data Corp. v. Barrenechea* (2009) 175 Cal.App.4th 1363, 1369, original italics.)  "[T]he critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech."  (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 (*Cotati*), original italics.)  If the moving party meets its burden, the burden shifts to the plaintiff to establish a probability that he or she will prevail on the merits.  (§ 425.16, subd. (b)(1); *Flatley v. Mauro* (2006) 39 Cal.4th 299, 314 (*Flatley*).)

"'Review of an order granting or denying a motion to strike under section 425.16 is de novo.  [Citation.]  We consider "the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based."  [Citation.]  However, we neither "weigh credibility [nor] compare the weight of the evidence.  Rather, [we] accept

6

as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.""'" (*Flatley*, *supra*, 39 Cal.4th at pp. 325-326.)

**B. Analysis**

    *1. Lennar's Cause of Action Arises From Protected Activity.*

    Lennar has not disputed on appeal that its cause of action as asserted against Stephens and Timothy Young arises from actions in furtherance of their rights of petition, namely, filing and litigating the federal class action. Lennar contends, however, that Melissa Young failed to satisfy the first prong of the anti-SLAPP analysis because, unlike her husband, she was not named as a plaintiff in the federal litigation. Additionally, Lennar emphasizes that defendants submitted no evidence with respect to any participation in the federal litigation as a nonparty except in response to Lennar's motion seeking "clarification" of the trial court's initial ruling. We agree with the trial court that Lennar's cause of action as to Melissa Young arises out of activity protected under the anti-SLAPP statute.

    "'Filing a lawsuit is an act in furtherance of the constitutional right of petition, regardless of whether it has merit.'" (*Trapp v. Naiman* (2013) 218 Cal.App.4th 113, 120 [Fourth Dist., Div. Two].) The protections of the anti-SLAPP statute extend, moreover, to "any act" in furtherance of a person's right of petition. (§ 425.16, subd. (b)(1).) "'Any act' includes communicative conduct such as the filing, funding, and prosecution of a civil action." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056 (*Rusheen*) [citing *Ludwig*

*v. Superior Court* (1995) 37 Cal.App.4th 8, 17-19 (*Ludwig*) [Fourth Dist., Div. Two].)

*Ludwig* further stands for the proposition that the anti-SLAPP statute may be invoked by one who did not personally engage in the protected communicative conduct: "A person can exercise his own rights by supporting the forceful activities of others; it would be absurd to hold that the confident opponent who takes the public podium is protected, while the shy opponent who prefers to lend moral support by standing silently in the audience is not." (*Ludwig*, *supra*, at p. 18.)

Applying these principles, we conclude that the federal litigation joined by Timothy Young also constitutes an act in furtherance of Melissa Young's right of petition, even though she was not named as a plaintiff. Timothy Young effectively brought suit on behalf of both himself and his wife, asserting rights belonging jointly to both. (See Fam. Code, § 1100, subd. (a) [placing "management and control of the community personal property" in "either spouse"; *Vick v. DaCorsi* (2003) 110 Cal.App.4th 206, 212, fn. 35) [with exceptions not relevant here, personal property acquired during marriage is community property, and "[a] cause of action to recover money damages, as well as the money recovered is . . . a form of personal property"].) Melissa Young owns an equal, undivided half-interest in the causes of action asserted by her husband arising from their joint purchase of a house, which itself is community property. (See *Vick*, *supra*, at p. 212 & fn. 35.) She likely funded the litigation, in the sense that any money her husband spent in relation to the litigation is probably

8

community property.[6]  Even setting aside Melissa Young's declaration regarding her active participation behind the scenes of the lawsuit, we would reach the same conclusion: Melissa Young is the "shy opponent . . . standing silently in the audience," while her husband takes the public podium by being named as a plaintiff, but the litigation is nevertheless an exercise of both of their rights.  (*See Ludwig*, *supra*, 37 Cal.App.4th at p. 18.)

Moreover, we are not persuaded that Melissa Young's declaration *should* be disregarded.  Lennar's assertion that its "clarification motion merely sought amplification of the court's decision on Defendants' anti-SLAPP motion, and was not an opportunity to present new evidence in order to remedy a deficient factual record," is both disingenuous and incorrect.  The motion, despite its label, was in substance a motion for reconsideration.  (See *Powell v. County of Orange* (2011) 197 Cal.App.4th 1573, 1577 [name of a motion is not controlling, and a motion asking the trial court to decide the same matter previously ruled on is a motion for reconsideration].)  Lennar had raised the issue of whether Melissa Young's role in the federal litigation constitutes activity falling within the protections of the anti-SLAPP statute in its opposition to defendants' anti-SLAPP motion, and at oral argument on that motion.  But it had done so only in passing, and without any supporting authority.  Lennar's motion asked the trial court to reconsider

---

[6]  There is no indication in our record of the rather improbable set of facts that might support the contrary conclusion, that Timothy Young funded the litigation entirely out of separate property.

9

the issue based on purported new law.  On appeal, Lennar has submitted no authority—nor are we aware of any—suggesting that the opposition to a motion for reconsideration may not include additional evidence tending to demonstrate new authority submitted by the moving party does not require reversal of the court's previous decision.[7]

Lennar contends section 425.16, subdivision (f), sets a hard deadline of 60 days from the service of the complaint for a defendant to submit any evidence in support of the anti-SLAPP motion, and Melissa Young's declaration was therefore untimely.  Not so.  Subdivision (f) of section 425.16 governs when an anti-SLAPP motion must be "filed"; it is silent as to whether evidence submitted in opposition to a motion for reconsideration of a ruling on a timely-filed anti-SLAPP motion may be considered.  Moreover, even a late-filed motion may be permitted "in the court's discretion, at any later time upon terms it deems proper."  (§ 425.16, subd. (f).)

The only authority cited by Lennar in support of its reading of section 425.16, subdivision (f), is inapposite.  In *Kunysz v. Sandler* (2007) 146 Cal.App.4th 1540, the issue was whether it was an abuse of the trial court's discretion to deny as untimely an

---

[7]  Indeed, it is a close question whether Lennar adequately showed, as it claimed, "new and different law" justifying reconsideration under section 1008—certainly a closer question than whether consideration of Melissa Young's declaration was appropriate.  The purported "new law" cited by Lennar as a basis for reconsideration is *Daniell v. Riverside Partners I, L.P.* (2012) 206 Cal.App.4th 1292 (*Daniell*) [Fourth Dist., Div. Two], issued a few days after oral argument on defendant's anti-SLAPP motion, but prior to the trial court's written order granting the motion.  But *Daniell* itself is discussed for less than half of a page of Lennar's motion, which is largely a vehicle for rehashing and expanding arguments previously made, and citing authority that either was, or could have been, presented to the trial court previously.

10

anti-SLAPP motion brought nine months after the plaintiff's operative first amended complaint was filed. (*Kunysz*, *supra*, at pp. 1542-1543.) Nothing in that opinion's discussion, let alone its holding, has anything to do with the proposition for which Lennar has cited it. We are persuaded, to the contrary, it was well within the trial court's discretion to consider Melissa Young's declaration, even though, as noted above, we do not find that evidence essential to our analysis.

Lennar further argues that even if Melissa Young's declaration is considered, she failed to establish she engaged in protected activity for two reasons: (1) the activity described in her declaration does not amount to instigating or inducing the lawsuit brought by her husband, and (2) Lennar's cause of action against her does not arise from any protected activity *she* may have engaged in, but rather that of her husband. For the reasons below, we reject both arguments.

With respect to the first issue: Lennar reads *Ludwig* to hold that instigating or inducing a lawsuit to be filed by another falls within the protections of the anti-SLAPP statute, while lesser levels of participation do not. Lennar argues in that regard that the "routine marital behavior" described in Melissa Young's declaration—assisting in gathering documents, discussing the case, joining in the "married couple's decision" to become involved with the lawsuit, and explicitly consenting to his being named as a plaintiff—does not rise to the level of instigation or inducement.

We do not read *Ludwig*, or the anti-SLAPP statute, so narrowly. (See *Kibler*, *supra*, 39 Cal.4th at p. 199 [anti-SLAPP statute is construed broadly to protect rights of

11

petition and free speech].)  In *Ludwig*, the court of appeal remarked that the "whole case" against the defendant invoking the protections of the anti-SLAPP statute depended "on the fact that he instigated" several lawsuits, and "encouraged" two other individuals to speak out against a construction project.  (*Ludwig*, *supra*, 37 Cal.App.4th at p. 18.)  But *Ludwig* does not hold that to be the only possible basis to conclude that one person is engaged in petitioning activity on another's behalf.  As discussed above, we find the circumstance that Timothy Young asserted causes of action owned equally by his wife, arising out of a transaction to which she was a party, for purchase of a house that is itself community property, to be sufficient basis to conclude the lawsuit to constitute an act in furtherance of Melissa Young's right of petition.

Neither does *Daniell*, *supra*, 206 Cal.App.4th at p. 1292—the new authority on which Lennar based its motion for reconsideration—require a different result.  *Daniell* holds that when a corporate entity has acquired the assets of another entity, and the predecessor entity could have invoked the anti-SLAPP statute, the acquiring entity may invoke the anti-SLAPP statute, too, in most circumstances.  (*Daniell*, *supra*, at p. 1302.)  The court explicitly states that "we do not intend to prejudge the question of whether similar principles should apply to natural persons.  *Certainly we do not intend to preclude*

12

*this possibility.*" (*Ibid.*, italics added.) Nothing in *Daniell* is inconsistent with our analysis above.[8]

To the contrary, the *Daniell* court's reasoning—that "[p]rotecting only the business that engages in the speech, without protecting its successors in interest, falls short of the purpose that the SLAPP Act is designed to serve"—only buttresses our analysis above. (*Daniell*, *supra*, 206 Cal.App.4th at p. 1302.) The *Daniell* court worried that the "chilling effect" of a corporation's knowledge that exercising first amendment rights "could subject a later buyer of its assets to a lawsuit—and moreover, that the buyer could not invoke the SLAPP Act to obtain a prompt dismissal of the lawsuit" might be "substantial." (*Ibid.*) We have no doubt that "substantial" is inadequately strong to describe the chilling effect resulting from an *individual's* knowledge that the exercise of petitioning rights relating to the joint purchase of a family home with the individual's spouse could subject *the spouse* to a lawsuit, particularly if the spouse could not invoke the protections afforded by the anti-SLAPP statute.

We also find Lennar's second argument—that its cause of action against Melissa Young does not arise from any petitioning activity *she* may have engaged in—to be unpersuasive. Lennar characterizes its claim against Melissa Young as a "straightforward

---

[8] Indeed, nothing in our analysis is inconsistent with the proposition that Lennar suggests (incorrectly) *Daniell* may be read to stand for, namely, "absent some sort of agency relationship . . . one individual cannot rely on the protected acts of another." Timothy Young in effect acted as an agent for his wife, by asserting claims that belong in part to her and relate to her rights as a party to the underlying transaction.

third-party indemnity claim," viewing Melissa Young's agreement to the indemnity clause to be a promise "to indemnify Lennar for costs incurred in defending a meritless suit by a third party (here Mr. Young)." But no matter how the claim is characterized, it is indisputable that Lennar's claim is "based on" the federal court litigation brought by Timothy Young. (*Cotati*, *supra*, 29 Cal.4th at p. 78.) For the reasons discussed above, that litigation is also an exercise of Melissa Young's right of petition.

*Navellier v. Sletten* (2002) 29 Cal.4th 82, is instructive. In that case, the plaintiffs filed suit in state court, alleging the defendant was liable for fraud and breach of contract for filing counterclaims in a federal action in breach of a contractual release. (*Id.* at pp. 86-87.) The dismissal of the state action on an anti-SLAPP motion was upheld by the California Supreme Court, in part because "but for the federal lawsuit and [defendant's] alleged actions taken in connection with that litigation, plaintiffs' present claims would have no basis. This action therefore falls squarely within the ambit of the anti-SLAPP statute's 'arising from' prong." (*Navellier*, *supra*, at p. 90.) Similarly, here, but for the federal litigation brought in part on Melissa Young's behalf, asserting claims that belong in part to her, Lennar's state law claim against her would have no basis.

In short, plaintiff's arguments to the contrary notwithstanding, Melissa Young is a "person whose exercise of . . . petition rights resulted in [her] being sued," so she falls within the protections of the anti-SLAPP statute. (*Shekhter v. Financial Indemnity Co.* (2001) 89 Cal.App.4th 141, 153.) Thus, all three defendants adequately showed that Lennar's claim against them arises from protected activity. We turn, therefore, to the

second prong of the anti-SLAPP analysis, whether Lennar met its burden to establish a probability that it will prevail on the merits of that claim.

    2.  *The Indemnity Clause Is Unenforceable Under California Law, Precluding Lennar from Establishing a Probability It Would Prevail on the Merits.*

The trial court concluded that the indemnity clause on which Lennar's claims are based is unenforceable, precluding any showing of probability of success on the merits. The trial court found the analysis of the Ninth Circuit in *Layman v. Combs* (9th Cir. 1992) 994 F.2d 1344 (*Layman*), to be "persuasive." We disagree with defendants' assertion that the indemnity clause at issue here is "nearly identical" to the one at issue in *Layman*, and doubt that the analysis of the *Layman* majority is directly applicable to this case. Nevertheless, we agree with the trial court's conclusion that the indemnity clause at issue is unenforceable.

In *Layman*, the Ninth Circuit considered an indemnity clause in a securities subscription agreement associated with a private placement of a company's stock. (*Layman*, *supra*, 994 F.2d at p. 1349.) Plaintiffs were investors who later sued the sellers, alleging a variety of fraudulent acts and omissions. (*Ibid.*) The subscription agreement indemnity clause required investors to "indemnify and hold harmless" the company, as well as individual sellers and their agents, against "any losses, claims, damages, liabilities, expenses (including attorneys' reasonable fees and disbursements), judgments and amounts paid in settlement resulting from the untruth of any of the warranties and representations contained herein, or the breach by the [investor] of any of

15

the covenants made by him herein." (*Id.* at p. 1350.) The sellers contended that when the plaintiffs sued them—alleging reliance on false representations made by sellers outside of the parties' written agreements, and claiming to have been misled regarding the risks of the investment—plaintiffs breached representations and warranties in the subscription agreement regarding lack of any reliance on such oral representations, thereby triggering the indemnity clause. (*Ibid.*) The sellers sought recovery of their attorneys' fees on that basis. (*Ibid.*) The Ninth Circuit noted that the clause, as interpreted by the sellers, would on its face apply not only to attorneys' fees, but would also "require a successful investor litigant to pay her own recovery"—a result that the majority of the Ninth Circuit panel found "absurd," over a strong dissent. (*Id.* at pp. 1352-1353, 1357-1358.) The Ninth Circuit instead concluded that the clause should instead be interpreted narrowly, finding that it "does not extend to fees or damages incurred in defending claims brought by the subscribing indemnitor." (*Id.* at p. 1353.)

In contrast, the indemnity clause at issue in our case explicitly applies *only* to "claims made by Buyer"; that is, only to claims brought by the indemnitor. It is simply not susceptible to an interpretation that it applies at all to claims asserted by individuals not party to the agreement, let alone exclusively to such claims, as the *Layman* majority concluded regarding the clause at issue in that case. The indemnity clause at issue here is therefore distinguishable from the one in *Layman*, and the Ninth Circuit's holding in that case—that the clause should be interpreted narrowly so as not to apply to claims brought

16

by the indemnitor, but only third parties—is not applicable. (See *Layman*, *supra*, 994 F.2d at p. 1354.)

Thus, we disagree with defendants' assertion that the clause at issue here is "nearly identical" to that in *Layman*, and we reject the notions that the clause is "unenforceable under *Layman*" (capitalization omitted) or that *Layman* is "controlling authority here." It does not follow, however, that the trial court's ruling must be reversed: "'[A] ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.'" (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19.) For the reasons discussed below, we agree with the trial court's conclusion that the clause is unenforceable under California law, not because of the reasoning in *Layman*, but rather because the clause is unconscionable.

Before delving into our analysis of unconscionability, we first attend to Lennar's argument that defendants forfeited any argument regarding unconscionability because they did not raise the issue until their reply brief below. The trial court declined to consider the issue, reasoning that Lennar had not had an opportunity to respond. Now, however, Lennar has had a full opportunity to respond, briefing the issue in both its opening and reply briefs on appeal. Moreover, unconscionability is, in the absence of a material factual dispute, a question of law that may be raised for the first time on appeal. (*Carmona v. Lincoln Millennium Car Wash, Inc.* (2014) 226 Cal.App.4th 74, 89, fn.6.)

17

Lennar cites authority for the proposition that whether a particular contractual clause is unconscionable "requires the development of a factual record to inform such analysis." (*Olinick v. BMG Entertainment* (2006) 138 Cal.App.4th 1286, 1293, fn. 7.)  But a factual record was developed below, and Lennar points to no material deficiency in the record that precludes us from deciding the matter.[9]  We therefore consider whether the clause at issue is unconscionable based on the present record.

### a.  Background regarding unconscionability analysis

"Unconscionability analysis begins with an inquiry into whether the contract is one of adhesion.  [Citation.]  'The term [contract of adhesion] signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.'  [Citation.]  If the contract is adhesive, the court must then determine whether 'other factors are present which, under established legal rules—legislative or judicial—operate to render it [unenforceable].'  [Citation.]  'Generally speaking, there are two judicially imposed limitations on the enforcement of adhesion contracts or provisions thereof.  The first is that such a contract or provision which does not fall within the reasonable expectations of the weaker or 'adhering' party will not be enforced against him.

---

[9] Lennar lists in its briefing various ways it would like to develop the factual record related to unconscionability.  But we see no possibility that any of the additional evidence proposed by Lennar could conceivably change the results of our analysis.  Thus, there are no disputed or undeveloped *material* facts missing from the record, and unconscionability is a question of law.

[Citations.]  The second—a principle of equity applicable to all contracts generally—is that a contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or "unconscionable."'" (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 113 (*Armendariz*), abrogated in part on another ground in *ATT Mobility LLC. v. Concepcion* (2011) __U.S.__, __ [131 S.Ct. 1740, 1746].)  But these two limitations are not, at base, separate concepts; rather, both are "aspects" of the overarching rubric of unconscionability.  (*Armendariz*, *supra*, at p. 113.)

"'[U]nconscionability has both a "procedural" and a "substantive" element,' the former focusing on '"oppression"' or '"surprise"' due to unequal bargaining power, the latter on '"overly harsh"' or '"one-sided"' results.  [Citation.]  'The prevailing view is that [procedural and substantive unconscionability] must *both* be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability.'  [Citation.]  But they need not be present in the same degree.  'Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves.'  [Citations.]  In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Armendariz*, *supra*, 24 Cal.4th at p. 114.)

If a court finds as a matter of law that a contract or any clause of a contract is unconscionable, the court may "refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." (Civ. Code, § 1670.5, subd. (a).)

### b. Procedural unconscionability

Lennar has conceded that the contracts at issue are contracts of adhesion. It argues, however, that defendants failed to prove any procedural unconscionability. We find the present record sufficient to establish only a low level of procedural unconscionability, but enough to satisfy the requisite minimum, and justify consideration of the substantive portion of the sliding scale.

The "oppression" component of procedural unconscionability "arises from an inequality of bargaining power of the parties to the contract and an absence of real negotiation or a meaningful choice on the part of the weaker party." (*Kinney v. United HealthCare Services, Inc.* (1999) 70 Cal.App.4th 1322, 1329 (*Kinney*).) "Surprise is defined as '"the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms."'" (*Gatton v. T-Mobile USA, Inc.* (2007) 152 Cal.App.4th 571, 581 [quoting *Stirlen v. Supercuts, Inc.* (1997) 51 Cal.App.4th 1519, 1532].)

With respect to oppression: A contract of adhesion, which Lennar has conceded the contracts at issue to be, by definition involves inequality of bargaining power and an

20

absence of real negotiation, leaving the weaker party with only a take it or leave it choice. (See *Armendariz*, *supra*, 24 Cal.4th at p. 113.) Moreover, an inequality of bargaining power may reasonably be inferred from the circumstance that defendants are purchasers of individual homes, while Lennar is a corporation in the business of building new homes in various parts of California. Nevertheless, "[t]here can be no oppression establishing procedural unconscionability, even assuming unequal bargaining power and an adhesion contract, when the customer has meaningful choices. . . ."[10] (*Wayne v. Staples, Inc.* (2006) 135 Cal.App.4th 466, 482 (*Wayne*).) In this context, "meaningful choices" refers to "reasonably available alternative sources of supply from which to obtain the desired goods and services free of the terms claimed to be unconscionable." (*Dean Witter Reynolds, Inc. v. Superior Court* (1989) 211 Cal.App.3d 758, 772 (*Dean Witter*).)

Lennar contends that defendants had reasonably available alternative sources from whom to purchase a home with a contract free of any similar indemnity provision, pointing to the circumstance that the other developers involved in the consolidated

---

[10] Some courts, even among those cited by Lennar for other purposes, have simply equated procedural unconscionability with the conclusion that a contract is a contract of adhesion. (See *California Grocers Assn. v. Bank of America* (1994) 22 Cal.App.4th 205, 214 ["The notion of 'procedural' unconscionability merely addresses the question whether a contract is adhesive."].) This approach, however, is at least in tension with the "sliding scale" analysis described in *Armendariz*, which requires a particularized analysis of oppression and surprise. (See *Armendariz*, *supra*, 24 Cal.4th at p. 114.) "Unconscionability analysis begins with an inquiry into whether the contract is one of adhesion" (*id.* at p. 113), but it does not end there, even just with respect to procedural unconscionability. (See also *Harper v. Ultimo* (2003) 113 Cal.App.4th 1402, 1409-1410 (*Harper*) [discussing relationship between concepts of adhesion and procedural unconscionability].)

21

federal litigation that included defendants' case did not include similar indemnity provisions in their contracts. Real property, however, is traditionally recognized as unique, particularly in the context of single family dwellings. (See, e.g., *Harbour Vista, LLC v. HSBC Mortgage Services Inc.* (2011) 201 Cal.App.4th 1496, 1505 ["real property is unique . . . ."]; Civ. Code, § 3387 [presumption that monetary damages are inadequate to remedy breach of agreement to transfer real estate; presumption is conclusive in case of single-family dwelling which the party seeking specific performance intends to occupy].) We do not find the authority cited by Lennar to be applicable here, because it deals with goods and services that are truly interchangeable in a way that real property is not. (Cf. *Dean Witter*, *supra*, 211 Cal.App.3d at pp. 761, 772 [self-directed individual retirement accounts]; *Wayne*, *supra*, 135 Cal.App.4th at p. 482 [shipping services and associated insurance coverage for office supplies]; *Morris v. Redwood Empire Bancorp* (2005) 128 Cal.App.4th 1305, 1320 [merchant credit card services].)

We conclude that Lennar's concession that the contracts at issue are contracts of adhesion, together with the circumstance that the contracts are for purchase of single family homes, entered into between a corporation that drafted the contract and individual homebuyers, suffice to demonstrate some level of the inequality of bargaining power and absence of real negotiation or meaningful choice that is the essence of oppression, as that term is used in the analysis of procedural unconscionability.

Nevertheless, it must be acknowledged that the evidence regarding inequality of bargaining power and absence of real negotiation or meaningful choice is not

overwhelming. There is no evidence, for example, that defendants are particularly new or unsophisticated home buyers. (Cf. *Pardee Construction Co. v. Superior Court* (2002) 100 Cal.App.4th 1081, 1089 ["[A]s potential purchasers of entry-level homes, plaintiffs stood in an economic position well below Pardee, the developer of hundreds of homes in the master plan development."].) There is no evidence in the record regarding any lack of availability of similarly priced housing stock in the region. (See *Woodside Homes of Cal., Inc. v. Superior Court* (2003) 107 Cal.App.4th 723, 729 [Fourth Dist., Div. Two] (*Woodside*) [noting lack of similar evidence in support of finding a low degree of procedural unconscionability].) There is no evidence of any disagreement by defendants or attempt to reject the indemnity provision by defendants, or other customers of Lennar. (See *ibid.*) In other words, the evidence in the record is not sufficient to conclude that there was a particularly high degree of procedural "oppression."

Similarly, although there is some evidence of surprise, that evidence is not strong, and is balanced by countervailing evidence. It is unquestionable that the indemnity clauses are a small piece of a "prolix printed form drafted by the party seeking to enforce [the disputed terms]." (*Kinney*, *supra*, 70 Cal.App.4th at p. 1329.) However, they do appear at the end of the "Homebuyer Disclosure Statement," on the same page as defendants' signatures, rather than buried elsewhere in a lengthy document. And defendants did not introduce any evidence establishing that they were in fact unaware of the indemnity clause—even Melissa Young's declaration only states that the provision

23

was "presented to us on a take-it-or-leave-it basis," not that the Youngs were unaware of it.

In sum, defendants have shown only a low level of procedural unconscionability. They demonstrated some degree of oppression, as that term is used in the analysis of procedural unconscionability, but not a high degree, and have made little if any showing of surprise. As such, to demonstrate unconscionability of the indemnity clause, defendants "must have established a *high* level of substantive unconscionability." (See *Woodside*, *supra*, 107 Cal.App.4th at p. 730.)

### c. *Substantive unconscionability*

In the circumstances of this case, the question of whether the indemnity clause is substantively unconscionable turns on whether it matters, for purposes of answering that question, whether or not defendants' federal litigation was successful. Lennar argues that the clause creates no unduly harsh results in *this* case, and thus no substantive unconscionability, because defendants have been unsuccessful in their federal litigation, and contractual provisions that shift attorneys' fees and costs to the prevailing party in litigation are generally enforceable. We disagree with Lennar's analysis.

Substantive unconscionability has been articulated in various ways, but the basics are well established: "'Substantive unconscionability addresses the fairness of the term in dispute. It "traditionally involves contract terms that are so one-sided as to 'shock the conscience,' or that impose harsh or oppressive terms"'" (*Wherry v. Award, Inc.* (2011)

24

192 Cal.App.4th 1242, 1248.)  The starting point of our analysis, therefore, is the contractual terms at issue.

Under the plain language of the clause, a "Buyer" who brings a claim against Lennar falling within its scope is not only responsible for paying Lennar's attorney fees and costs, no matter whether the Buyer prevails on the claim or not.  The Buyer is also responsible for any "liabilities, actions, demands and damages" arising out of such a claim.  In other words, on its face, the indemnity provision precludes any possibility that a Buyer who has a meritorious claim of fraud falling within the scope of the indemnity clause could be made whole; any judgment obtained would be payable by the *Buyer*, not Lennar, and in addition the Buyer would be responsible for Lennar's attorneys' fees and costs, win or lose.[11]

Lennar urges, however, that we look not to the scope of the language of the indemnity clause in the abstract, but rather as it is applied strictly to the facts of this case.  Lennar has conceded that the clause is unenforceable as against a party who brings a suit falling within the scope of the indemnity clause that turns out to be meritorious, stating that "all parties agree that the indemnity provision would not be enforceable had Defendants prevailed on their fraud claim in federal court."  Here, defendants have not—

---

[11] We doubt that the language of Lennar's contracts would necessarily preclude any possibility of meritorious claims of fraud based on oral misrepresentations.  (See *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1171, 1182 [overruling *Bank of America etc. Assn. v. Pendergrass* (1935) 4 Cal.2d 258, and reaffirming broad applicability of fraud exception to parol evidence rule].)

at least so far—prevailed in their federal litigation. As such, Lennar proposes, the result in this case is not unduly harsh or oppressive—fees and costs are just shifted to the prevailing party in the federal litigation, and there is "nothing substantively unconscionable" about such a result.

Some courts have taken approaches similar to the one Lennar proposes in contexts somewhat different from the present case. In *Barnebey v. E.F. Hutton & Co.* (M.D. Fla. 1989) 715 F.Supp. 1512 (*Barnebey*), for example, the defendants in a securities lawsuit counterclaimed seeking to recover attorneys' fees and costs from the plaintiffs based on an indemnity provision in an investor subscription agreement. (*Id.* at p. 1519.) The defendants contended the plaintiffs' suit breached certain warranties in the subscription agreement, triggering the indemnity clause, but limited their counterclaims to attorneys' fees and costs associated with any unsuccessful claims brought by the plaintiffs. (*Id.* at p. 1520.) On that basis, the court declined to consider whether the indemnity clause would be against public policy and/or unenforceable as to any judgment that might have been obtained by the plaintiffs, had the litigation reached a different result, and allowed the counterclaims for indemnity to survive summary judgment with respect to the plaintiffs' unsuccessful claims. (*Id.* at pp. 1521-1522.)

*Atari Corp. v. Ernst & Whinney* (9th Cir. 1992) 981 F.2d 1025 is another example. In that case, Atari Corporation had agreed in a merger agreement that it would indemnify officers of the acquired corporation for any acts and omissions relating to their service as officers. (*Id.* at p. 1031.) Atari itself later sued those officers, bringing claims of

26

securities fraud, common law fraud, and various other claims. (*Id.* at p. 1027.) Summary judgment was granted in favor of the officers on Atari's claims, and the 9th Circuit reversed the trial court's denial of the officers' counterclaims for indemnity. (*Ibid*.) In dictum, the court noted the public policy prohibiting one party from contracting out of its liability for intentional torts, but reasoned that "exoneration for fraud is not the issue here" because the officers had been found not liable. (*Id.* at p. 1032.)

Even in the context of securities litigation, however, courts do not uniformly follow the *Barnebey* and *Atari* court's analytical method, whereby the indemnitee's liability or lack thereof is seen to have some bearing on the enforceability of the indemnity clause triggered by the indemnitor's suit. In *Doody v. E.F. Hutton & Co., Inc.* (D. Minn. 1984) 587 F.Supp. 829 (*Doody*), for example, investor plaintiffs brought securities fraud claims; defendants counterclaimed for indemnity pursuant to a clause in an investor subscription agreement, which defendants contended to be triggered by the suit. (*Id.* at p. 831.) The district court declined to enforce the indemnity clause, granting summary judgment to plaintiffs with respect to the counterclaims, reasoning that the indemnity clause was counter to the public policy of encouraging the prosecution of securities fraud actions. (*Id.* at p. 833.) Importantly, the court's reasoning with respect to the enforceability of the indemnity clause was completely independent of whether or not the plaintiffs' suit had merit: that was a matter left to be determined at a later trial. (*Ibid.*)

Moreover, the circumstances of this case are distinguishable from those of each of the cases relied on by Lennar. The present case does not involve the obligation of a

corporation to indemnify its officers, and we agree with the trial court that any analogy to such cases is "nonsensical." Neither are the circumstances giving rise to securities litigation fairly comparable to those of an individual or family buying a home pursuant to a contract of adhesion drafted by the seller, a corporation in the business of building homes. (See *Layman*, *supra*, 994 F.2d at p. 1358 (dis. opn. of Kozinski, J.) [arguing indemnity clause should be enforced because investors "were sophisticated and obviously wielded substantial bargaining power," and "got legal and financial advice galore before committing to the deal"].) Nothing in this opinion conflicts with the reasoning of those cases approving and enforcing indemnification clauses—even first party indemnification clauses—on fundamentally different sets of facts.

More analogous to the circumstances of this case is authority involving arbitration provisions in contracts between corporations and consumers. In such cases, as here, courts often analyze provisions in contracts of adhesion between corporation and consumer having the practical effect of limiting the consumer's recourse to the courts in the event of a dispute. In those contexts, there are "any number of cases" where arbitration clauses effectively limiting the defendant corporation's exposure to damages have been found substantively unconscionable. (*Harper*, *supra*, 113 Cal.App.4th at p. 1407 [collecting cases].) In deciding whether arbitration clauses are unconscionable, courts have not looked to the merits of the plaintiffs' claims; a motion to compel arbitration is naturally considered before the merits of the cause. Rather, they look to the language of the clause at issue. (*Ibid.* [finding arbitration clause unconscionable based on

the "bare language" of the contract]; see also *id.* at p. 1411 [regarding the potential outcome of the future trial of plaintiffs' underlying claims, stating "who knows?"].) Clauses that, on their face, leave the consumer with no practical means of redress—let alone language precluding even a theoretical possibility of meaningful recovery—have "met with uniform judicial opprobrium."(See *id.* at p. 1407.)

Here, under the bare language of the indemnity clause, there is not even the theoretical possibility a homebuyer could be made whole for any damages arising from fraud committed by Lennar with respect to disclosures. The clause is a paradigmatic example of a "'heads I win, tails you lose'" proposition, purporting to bar any possibility of meaningful recovery for claims falling within its scope, regardless of merit. (See *Harper*, *supra*, 113 Cal.App.4th at p. 1407.) We find this to establish a high degree of substantive unconscionability, at least within the circumstances of this case—sufficiently high as to outweigh the relatively low degree of procedural unconscionability. We therefore conclude that the indemnity clause is unconscionable.

### d. Application of Civil Code section 1670.5.

Having concluded that the indemnity clause at issue is unconscionable, we must determine how to exercise our discretion pursuant to Civil Code section 1670.5. On the facts of this case, we see two primary alternatives: (1) to refuse to enforce the indemnity clause at all, or (2) to limit its applicability by treating it as if it were a clause shifting attorneys' fees and costs to the prevailing party. In our view, the first alternative is more appropriate.

29

In suggesting that we instead take the second alternative, Lennar again makes much of the circumstance that defendants' federal litigation has, to this point, been unsuccessful, at least at the trial level. Lennar in essence urges us to enforce the indemnity clause as if it were a typical prevailing party fee-shifting clause, thereby "holding Defendants to their promise to pay for the expenses their meritless claims have generated."

We agree with Lennar that there is nothing generally absurd or unconscionable about prevailing party clauses. Civil Code section 1717 specifically authorizes courts to enforce contractual provisions requiring payment of attorney's fees and costs to the prevailing party in a dispute. (See, e.g., *Santisas v. Goodin* (1998) 17 Cal.4th 599, 610-611 [discussing Civ. Code, § 1717].) But Lennar chose a different course in drafting the contracts at issue, seeking to impose a provision that purports to have much broader effect than a typical prevailing party clause. If we were to enforce the indemnity clause as if it were a typical prevailing party clause, we would in essence be endorsing Lennar's overreach, allowing Lennar to continue to benefit from the in terrorem value of the language it drafted and imposed on its customers. In other words, under the circumstances of this case, only by refusing to enforce the indemnity clause at all do we provide Lennar any incentive to conform the language of its contracts with consumers to the limits of enforceability under California law.

We decline Lennar's proposal to limit the indemnity clause to act as a typical prevailing party clause—in other words, to impose no limitation at all, as applied to the

30

facts of this case. We instead exercise our discretion to "enforce the remainder of the contract without the unconscionable clause," thereby giving the indemnity clause no force or effect. (See Civ. Code, § 1670.5, subd. (a).)

Absent an enforceable indemnity clause, Lennar cannot show a likelihood of success on its claims for express contractual indemnification. Lennar therefore cannot satisfy its burden under the second prong of the anti-SLAPP analysis, and defendants' anti-SLAPP motion was properly granted.

## III. DISPOSITION

The order appealed from is affirmed. Defendants shall recover their costs on appeal.

CERTIFIED FOR PUBLICATION

HOLLENHORST
                                                                      J.

We concur:

RAMIREZ
                    P.J.

MILLER
                    J.

31